UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Caption:

_Victor Bondaruk_

_____

_____

_Full name(s) of Plaintiff(s)_

v.

_PNC Bank_

_____

_____

_Full name(s) of Defendant(s)_

**COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

CIVIL ACTION
NO._____

This action is brought for discrimination in employment pursuant to (check only those that apply):

__V__    Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to
2000e-17 (race, color, gender, religion, national origin).
_**NOTE:** In order to bring suit in federal district court under Title VII, you must first
obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
Commission._

_____    Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621-634.
_**NOTE:** In order to bring suit in federal district court under the Age Discrimination
in Employment Act, you must first file a charge with the Equal Employment
Opportunity Commission, and you must have been at least 40 years old at the time
you believe that you were discriminated against._

_____    Americans with Disability Act of 1990, as codified, 42 U.S.C. §§ 12112-12117.
_**NOTE:** In order to bring suit in federal district court under the Americans with
Disabilities Act, you must first obtain a Notice of Right to Sue Letter from the Equal
Employment Opportunity Commission._

_____    Pennsylvania Human Relations Act, as codified, 43 Pa. Cons. Stat. §§ 951-963
(race, color, family status, religious creed, ancestry, handicap or disability, age,
sex, national origin, the use of a guide or support animal because of blindness,
deafness or physical handicap of the user or because the user is a handler or trainer
of support or guide animals).

(Rev. 10/2009)

-1-

**NOTE:** *In order to bring suit in federal district court under the Pennsylvania Human Relations Act, you must first file a complaint with the Pennsylvania Human Relations Commission or the Philadelphia Commission on Human Relations, and then you must wait one year prior to filing a lawsuit.*

## I.  Parties in this complaint:

A.  List your name, address and telephone number.   Do the same for any additional plaintiffs named.   Attach additional sheets of paper as necessary.

Plaintiff    Name: *Victor Bondaruk*
Street Address: *2555 Welsh Rd Apt 232*
County, City: *Philadelphia*
State & Zip: *PA 19141*
Telephone Number: *(857) 928-6385*

B.  List all defendants' names and the address where each defendant may be served.   Make sure that the defendant(s) listed below are identical to those contained in the caption on the first page.   Attach additional sheets of paper as necessary.

Defendant    Name: *PNC Bank*
Street Address: *One PNC Plaza, P1-POPP-22-C, 249 Fifth Avenue*
County, City: *Pittsburgh*
State & Zip: *PA 15222*
Telephone Number: *(412) 762-6448*

C.  The address at which I sought employment or was employed by the defendant(s) is:

Employer: *PNC Bank*
Street Address: *2401 Welsh Rd*
County, City: *Philadelphia*
State & Zip: *PA 19141*
Telephone Number: *(215) 698-5969*

## II.  Statement of the Claim

A.  The discriminatory conduct of which I complain in this action includes (*check only those that apply to your case*):

_____  Failure to hire me

__✓__  Termination of my employment

_____  Failure to promote me

-2-

_____ Failure to reasonably accommodate my disability

_____ Failure to reasonably accommodate my religion

__V__ Failure to stop harassment

_____ Unequal terms and conditions of my employment

__V__ Retaliation

_____ Other (*specify*):_____

**NOTE:** *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

B.    It is my best recollection that the alleged discriminatory acts occurred or began on or about: (month) _April_, (day) _13_, (year) _2019_.

C.    I believe that the defendant(s) (check one):

    _____ is still committing these acts against me.

    __V__ is **not** still committing these acts against me.

D.    Defendant(s) discriminated against me based on my (*check only those that apply and state the basis for discrimination, for example, what is your religion, if religious discrimination is alleged*):

    _____ race _____    _____ color _____

    _____ religion _____    _____ gender/sex _____

    __V__ national origin _RUSSIAN/UKRENIAN_

    _____ age    My date of birth is _____ (*Give your date of birth only if you are asserting a claim of age discrimination*)

E.    The facts of my case are as follow (*attach additional sheets of paper as necessary*):

On October 17, 2019, I was discharged from my position as a Branch Sales and Service Associate II awhile working at the Welsh Rd branch of PNC Bank located at 2401 Welsh Rd Philadelphia, PA. I was employed in this position since August 1, 2016. I am Russian and Ukrainian. I was the only person of my national origin that worked at that location. My manager, Vaughn Vaughnson, Black/African-American, harassed me due to my national origin. See additional sheets of paper for a full complaint.

-3-

November 20, 2020

## Complaint for Employment Discrimination (Item II, E)

On October 17, 2019, I was discharged from my position as a Branch Sales and Service Associate II while working at the Welsh Rd branch of PNC Bank located at 2401 Welsh Rd, Philadelphia, PA. I was employed in this position since August 1, 2016. I am Russian and Ukrainian. I was the only person of my national origin that worked at that location. My manager Vaughn Vaughnson, Black/African-American, harassed me due to my national origin. I complained to the regional manager, Raymond DiSandro, that Mr. Vaughnson harassed me due to my national origin and retaliation due to my prior complaints about Mr. Vaughnson's prior unacceptable behavior from my email complaints. Mr. DiSandro told me that I needed to report my allegations to Employee Relations, who then told me that I needed to complain to the regional manager. No one in PNC Bank wanted to help me. On October 8, 2019, I wrote a letter asking for a transfer to another branch so that the harassment could stop. While working at PNC Bank, I received numerous awards and outstanding performances. I was the best banker in the region overseen by Mr. DiSandro based on my sales result and customer experience index.

Shannon Schweda, the investigator, told me that I was terminated for violating PNC Bank's so called same-day referral rule. This rule was that once you spoke to a client you had to input them into the system the same day. It should be noted that PNC bank did not have such a referral rule and, if they did, no one followed the rule or training was not given for the rule. Moreover, this was a business referral and the only training I received was how to open a business account.

In her response to my discrimination charge, Shannon Werner, a chief employment councel of PNC Bank, referenced Customer Referral Requirements (Exhibit 5 in the PNC's position statement) and Placing a Genesis Customer Referral (Exhibit 6 in the PNC's position statement) as evidence that the referral I submitted violated their rules. Both documents, however, were reviewed after the date of my termination and were changed to support their claims. Notably, she quoted a rule from Placing a Genesis Customer Referral that was reviewed on February 25, 2020, 10 days before she responded to my charge on March 5, 2020, and 43 days after I submitted my formal charge with EEOC on January 14, 2020.

Despite the fact that the business customer in question was not a random walk-in client and I was the only branch representative who he trusted and came to for any personal or business needs (I opened his business account and this was my fourth

merchant services referral after the client met and discussed the solution with 3 different merchant services representatives!) as the shared notes to that account indicate, **Ms. Schweda, Mr. DiSandro and Mr. Vaughnson** decided to terminate my employment, even though Customer Referral Requirements (Exhibit 5 in the PNC's position statement) assume the corrective action first: "Be aware that submitting a referral that does not meet the criteria of a valid referral may result in corrective action up to and including termination from employment." It means that **they chose the most severe punishment by terminating my employment** while they had never taken a similar corrective action against me before and I was the leading sales person in the whole Bucks County region showing exceptional results and bringing tremendous profit to the Welsh Rd branch. I was also a person who informed Mr. Vaughnson and Mr. DiSandro about the referral issue as soon as it happened. It contradicts Ms. Werner's claims that I was trying to manipulate sales.

The Notice of Determination from the Department of Labor with regard to my unemployment claim clearly says that "the employer [PNC] has not sustained its burden of proof" and, therefore, "benefits should be allowed under Section 402(e) of the Pennsylvania Unemployment Compensation Law." PNC had more than a month up to November 22, 2019 to appeal this determination, but chose not to do so because of the clear lack of evidence at that moment. They needed time to correct their referral requirements.

Ms. Werner admitted that as a branch manager Mr. Vaughnson did not have "financial motivation... to take credit" for my referral because his "incentive payments were determined by the total number of referrals made by all employees at the branch." It means there were different reasons why Mr. Vaughnson wanted to steal the client from me in October of 2019. Besides his hatred and apparent discrimination against me, **Mr. Vaughnson** was under pressure to do his direct job which was to sell business solutions. At that time, he was far behind in his performance and even **asked me** as the leading sales employee in the branch **to send business clients to him because "I would also get credit," he said. This was a clear violation of PNC Code of Ethics. Since I refused to cooperate and, therefore, violate the rules, he started looking up my business clients I was closely working with and inviting them for an appointment.** Because it was my responsibility to report to Mr. Vaughnson all clients who were interested in merchant services, he knew who he was inviting for an appointment. Besides, my shared notes in Genesis clearly indicated that there was an opportunity there for merchant services. When I asked him, why he invited the client I had been working with for more than a year, he told me that he did not know it was him, an outright lie from

Mr. Vaughnson who wanted to steal the results of my hard work and to hurt me due to my multiple complaints about him.

Ms. Werner knew what was really happening in the Welsh Rd branch and, therefore, altered my email to Mr. DiSandro in Exhibit 7 of her position statement that she submitted to EEOC as evidence of my violation of their made-up referral rule. In that same email, I asked Mr. DiSandro to transfer me to another branch as soon as possible as I could no longer put up with Mr. Vaughnson's inappropriate and unethical behavior. I was terminated a few days later.

Ms. Werner should know that **tampering with evidence is a criminal offense.** She can read more about it in Title 18 of the Pennsylvania Crimes Code and in section 4910.

I believe I have been discriminated against due to my national origin Russian and Ukrainian, in violation of Title VII of the Civil Rights Act of 1964, as amended, in that I was harassed by my manager, and when I complained to the regional manager and the employee relations department, I was discharged in retaliation for violating a rule that does not exist. The area in which the Welsh Rd branch of PNC Bank is located is mainly Russian and they are underserved. After my discharge my job was posted, and it no longer required that the employee speaks Russian. The job posting was removed as soon as Ms. Werner was informed that I filed my discrimination charge with EEOC.

There are **many examples** that led me to believe that I was discriminated at PNC bank due to my national origin.

When Mr. Vaughnson hired an American guy, Michael Piontko, for the same BSSA position to replace a Spanish speaking girl, Melissa Gomez, who was hired by the previous manager who also hired me, my new manager, Mr. Vaughnson, quickly teamed up with the new employee and they started helping each other with referrals and other banking solutions. I complained, for example, about the fact that Mr. Piontko was sending customers who came for home lending solutions (home equity loans) exclusively to Mr. Vaughnson while I was free at that time and more experienced than any of them. Mr. Vaughnson, in his turn, sent to Mr. Piontko clients who expressed a need for mortgage and credit cards and took Mr. Piontko several times to the university events to promote PNC products and open up to twenty new checking accounts as a result while I got nothing. Mr. Vaughnson never offered me to go with him. The first time, he went there behind my back leaving me alone in the branch for almost the whole day. When I found out why both of them were missing,

I was frustrated that **my manager did not treat me the way he treated the American employees.** I complained to Mr. DiSandro about these issues through emails and got no responses at all.

I suspected **Mr. Vaughnson also did not like my accent** as he tried to mock me when we were arguing with him about his inappropriate and unethical behavior.

When Latasha Pollard, a Black/African-American teller lead in my branch, celebrated her two-year job anniversary, Mr. Vaughnson, a Black/African-American branch manager, gathered us all together in the morning and congratulated her. When I had my three-year job anniversary on August 1, 2019, he put a gift box with the letter from PNC's CEO on my table on July 10 and did not say a word (I have a picture of that present made that day on my cell phone in the branch). No one knew that I had the anniversary on August 1, 2019. Even Mr. DiSandro, my regional manager, ignored that memorable date. He never forgot, however, to mention my name in every conversation with other branch employees when he needed to prove that it was possible to be very successful at PNC. In contrast, I received congratulations from employees working at other branches, for example, a Black/African-American branch manager, Audrey Ackaa, who really appreciated my work and contribution to PNC's success.

Evidence suggests that **I had been continuously discriminated at this PNC branch.** I complained about Mr. Vaughnson and some of my co-workers to Mr. DiSandro and the Employee Relations department and never got any response to my complaints.

**Mr. Vaughnson apparently did not like Russian clients** who were coming to the branch as no one wanted to deal with him (some based on their previous unsuccessful attempts to get help from him) and get his financial consultation. Russian clients preferred to wait for me because I spoke the same language and they felt comfortable discussing their financial needs and problems with me. Mr. Vaughnson did not clearly understand Russian clients who usually had a strong accent (the tellers sometimes asked me to help translating clients' requests) and it annoyed him. He hated seeing me working with them as he could not understand what I was doing for them and why it sometimes took that long. I should say that I was equally attentive to any client's demands and spending the same amount of time with them having a full conversation to uncover clients' needs and help them improve their financial well-being. Mr. Vaughnson was sometimes smiling maliciously after speaking with the Russian clients in the waiting area as if they were inferior people because they could not explain what they came for in a clear English

language. **I remember him saying** in September of 2019 on his way to his desk after speaking with the Russian clients who were waiting for me and who he did not understand: **"I am tired of these Russians."**

With every month, I felt **Mr. Vaughnson's profound contempt for me was growing and eventually turned into harassments.** It reached the point when he allowed himself to **remove the chairs at my desk** and put them to another room, so that I could not sit and take any clients, **shut down my computer by pulling the plug** while I was still typing, **hang up my phone when I was talking** with the loan department or **lie my customers in the face** during the loan closing claiming that the branch was closing in five minutes and the teller, Gail Pichkan, had to leave due to a fake emergency directly affecting my sales results and many more examples that you can find in my email complaints to Mr. DiSandro and phone complaints to the Employee Relations department (some evidence are also in the shared notes to accounts involved in the matter). Again, I constantly complained, but no one listened.

I told Mr. DiSandro that **Mr. Vaughnson disrespected me in comparison to other branch employees (all Americans), started harassing me, his behavior became completely inappropriate for the branch manager and he kept retaliating against me for my constant complaints about him.** I also told him that because he as the regional manager was taking no actions, Mr. Vaughnson's behavior was getting worse each day (it eventually led to that referral issue). Mr. DiSandro then said that I could complain to ERIC (Employee Relations Information Center) if I believed that was the right thing to do. I did call again to ERIC and the first thing they asked me was whether I spoke with my regional manager. I said that I did and that he recommended me to speak with you. They said that they would take my complaint, but would have to go to Mr. DiSandro for clarification. Nothing happened after that or any other calls I made to ERIC. No one had ever followed up with me on my complaints as if they never existed.

In fact, **Mr. DiSandro supported Mr. Vaughnson's behavior and did not want to help.** When I called him on his cellphone to complain about the above issue with the chairs removal as I could not work, Mr. DiSandro said: "You should **follow your manager's orders.**" That day in the morning, I was forced to leave the branch without a reason. This was unheard-of.

Mr. Vaughnson was visibly angry after I sent my email about the referral issue to Mr. DiSandro on October 8, 2019 asking him in the same email to transfer me to another branch due to my manager's unethical and inappropriate behavior. My client

just left and I was sitting alone when he was passing by me to the safe deposit boxes and said: **"Russian clown."** Although he did not tell me that in the face, I was confused and frustrated as there was no one else nearby who he could tell that to. When Mr. DiSandro asked me to come to another branch to speak with him, I was hoping we would discuss the details of my transfer to another branch, possibly the branch he invited me to. In fact, he invited me to the Krewstown Rd branch located at 9246 Krewstown Rd, Philadelphia, PA 19115 to speak with Ms. Schweda.

I should say that Mr. DiSandro was able to hide his discrimination against me better than did Mr. Vaughnson. However, when he invited me to that branch, he made sure that my important phone conversation with Ms. Schweda that day on October 11, 2019 was not recorded and the only evidence of that referral issue was my email to him. At the time when all lines in PNC branches were recorded since the end of September of 2019 (I even took a required training about the phone recordings in PNC branches), **Mr. DiSandro said** that I would be talking with the investigator through his laptop with the phone line available nearby and that **the conversation would not be recorded. Ms. Schweda, the Senior Employee Relations Investigator, did not object to this cover-up.** When I spoke with her, I addressed the issue, but I felt that it did not matter what I was saying, everything had been already decided, yet I was confident I was right. This was the conversation when she invented the same-day referral rule that Ms. Werner did not even mention in her response because she knew this made-up rule had been violated at PNC on a daily basis.

It was very beneficial for PNC Bank to terminate my employment. Mr. DiSandro knew from my last email to him on October 8, 2019 – the email that Ms. Werner has altered – that due to multiple complaints about Mr. Vaughnson's unethical behavior, I no longer wanted to work for him and he was losing me as the best employee in his region. So the timing was just right. This was the beginning of the fourth financial quarter and PNC was supposed to pay me my large bonus check for the previous quarter in the amount of almost $15,000 in three weeks with my first regular paycheck in November. Their rules, which were explained to me by Mr. DiSandro after my termination, allow PNC Bank, in clear violation of Pennsylvania's Wage Payment and Collection Law, not to pay any earned commission to employees who were no longer active at the time of payment. On top of that, I was on track to earn even higher bonuses and get additional $5,000 that PNC pays to top producers when the employee meets requirements two quarters in a row. I had many active home loans in Genesis and great referrals and all that was purposefully taken away from me.

Discrimination of the Russian/Ukrainian people, however, did not stop with my termination.

When I was hired back in August 2016, the Russian language was a requirement for the BSSA position at the Welsh Rd branch located at 2401 Welsh Rd, Philadelphia, PA 19114. I was specifically asked during my interview whether I knew the Russian language. Besides, my CV clearly indicated that I worked in Russia before I came to the United States and assumed a new position at PNC bank. I was hired **by my previous manager** to address the issue of the underserved Russian population that predominantly resided in that area. And I successfully did. More than a month after I was terminated, PNC posted my position again on their website. The Russian language was not only NOT required, but also NOT even preferred at the time when the neighboring Bank of America, for example, located one block away at 2439 Welsh Road, Philadelphia, PA 19114 had a Russian employee holding the same position called a Relationship Manager. Therefore, both Mr. Vaughnson – who did not hire me, but was instrumental in my termination – and his manager Mr. DiSandro have given a clear preference to Americans and discriminated against potential employees of Russian/Ukrainian origin. Ms. Werner did not address this issue in her position statement, although it was mentioned in my discrimination charge with EEOC. Instead, she quickly removed the job posting from the PNC's website, but the evidence still exists saved in many different forms. Even a year later, PNC has failed to hire a Russian speaking employee to the Welsh Rd branch. In fact, to the best of my knowledge, no employees of Russian/Ukrainian origin have been hired in any PNC branch in the 15 miles radius overseen by Mr. DiSandro to address the needs of the underserved Russian community.

Two months after I was terminated, I met few long-time Russian business clients of PNC bank who were complaining about the way they were treated by Mr. Vaughnson in the branch. They claimed he did not want to help them even with the simple issues and asked them to go to another branch instead. They said they were never disrespected like that or had any similar issues with me and that I was very helpful. They also said that they did not want to come to the Welsh Rd branch anymore and see Mr. Vaughnson. Some of them even asked me how to submit a complaint so that it was heard. I told them that they could try to reach out to his manager directly (I gave them Mr. DiSandro's phone number), but I knew it would yield no result as the Russian/Ukrainian people were not treated equally at this PNC branch overseen by Mr. DiSandro who ignored any complaints about Mr. Vaughnson. I will make sure, however, that those Russian business clients and others involved in the matter are properly heard in court.

My termination had become a complete shock for my clients and branch employees in the Bucks county region. A few days before I was terminated, a Black/African-American client was so happy about the way I handled his finances for the last year that after I managed to get his credit application approved, he said: "PNC is very lucky that you work for them!" He was supposed to give me a perfect review in the coming week, but I was terminated at that time. He called me a few weeks later to find out what happened and said he was very disappointed that PNC had been terminating good hard-working people. He said he would most likely change the bank and was wondering what bank I was working for at that time. Another wealthy client of Arab origin who had been regularly discussing his personal and business needs with me in the branch called me 5 months after I was terminated to do a home equity loan with him and told me that he was very disappointed that PNC terminated me and not Vaughn Vaughnson "who does not know anything," he said. He assured me that he could go to court and give his testimonials if I needed his help. Those are just few examples of clients I worked with who expressed their concern about the way PNC Bank treats their employees and who could speak out.

Managers at other PNC branches I knew well did not believe I was terminated for a reason and said that any bank would be proud to have me. When I applied for a similar position at other banks, however, my application was denied and I was no longer considered for the role after I revealed the bogus reason Ms. Schweda gave me upon termination. Seeing the same pattern, I decided to tell two other banks that it was my decision to leave PNC bank to see what happens and was immediately invited for an interview. At the interview, the manager said that I had all the skills they needed and more and was very satisfied with my answers, but also asked me about the names of my branch and regional managers and the branch I worked at. A few days later my application was declined and the position remained open for another month. I then applied for a position at that same bank that does not require banking experience at all and was denied two days later. There was no other explanation other than that my branch and regional manager defamed me so that I could not find a job in the bank.

In her response, Ms. Werner provided examples of people of unknown origins who were allegedly terminated from PNC because they "manipulate[d] sales by improperly recording referrals," but we do not know their stories. Some of them may have faced similar discrimination, but have not gone that far to let EEOC know that non-American people have been discriminated at PNC on a regular basis, let alone to file a lawsuit in federal court.

As fully explained above, PNC did discriminate against me due to my national origin and now tries to hide their wrongdoings by bluntly lying and forging evidence. Therefore, I ask the court to bring justice in this discrimination case by reviewing all my original emails and phone recordings that would show the full picture. One thing you would not find is the PNC's response to my request for help.

**NOTE:** *As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the Pennsylvania Human Relations Commission, or the Philadelphia Commission on Human Relations.*

**III.    Exhaustion of Administrative Remedies:**

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on: _January 14, 2020_ (Date).

B.    The Equal Employment Opportunity Commission (*check one*):

   ____    has not issued a Notice of Right to Sue Letter.
   _✓_    issued a Notice of Right to Sue Letter, which I received on _9/2/2020_ (Date).

   **NOTE:** *Attach to this complaint a copy of the Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

C.    *Only plaintiffs alleging age discrimination must answer this question.*

   Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct (*check one*):

   ____    60 days or more have passed.
   ____    fewer than 60 days have passed.

D.    It is my best recollection that I filed a charge with the Pennsylvania Human Relations Commission or the Philadelphia Commission on Human Relations regarding the defendant's alleged discriminatory conduct on: _January 14, 2020_ (Date).

E.    Since filing my charge of discrimination with the Pennsylvania Human Relations Commission or the Philadelphia Commission on Human Relations regarding the defendant's alleged discriminatory conduct (*check one*):

   ____    One year or more has passed.
   _✓_    Less than one year has passed.

## IV.   Relief

**WHEREFORE**, Plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs as well as (*check only those that apply*):

_____   Direct the defendant to hire the plaintiff.

__✓__   Direct the defendant to re-employ the plaintiff.

_____   Direct the defendant to promote the plaintiff.

_____   Direct the defendant to reasonably accommodate the plaintiff's disabilities.

_____   Direct the defendant to reasonably accommodate the plaintiff's religion.

__✓__   Direct the defendant to (*specify*): *Stop defaming the plaintiff when other employ-*
        *inquire about him*

__✓__   If available, grant the plaintiff appropriate injunctive relief, lost wages,
        liquidated/double damages, front pay, compensatory damages, punitive damages,
        prejudgment interest, post-judgment interest, and costs, including reasonable
        attorney fees and expert witness fees.

_____   Other (*specify*):_____

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this _20_ day of _November_, 20_20_.

Signature of Plaintiff

Address    _2555 Welsh Rd Apt 232_
           _Philadelphia, PA 19114_

Telephone number   _(857) 928-6385_
Fax number (*if you have one*)   _____

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 530-2020-01754 |

| PENNSYLVANIA HUMAN RELATIONS COMMISSION | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone | Year of Birth |
|---|---|---|
| MR. VICTOR BONDARUK | (857) 928-6385 | 1985 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 2555 WELSH ROAD, APT 232,  PHILADELPHIA, PA 19114 | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| PNC BANK NA | 15 - 100 | (215) 698-5930 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 2401 WELSH ROAD,  PHILADELPHIA,  PA 19114 | | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 04-13-2019 | 10-17-2019 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.  On or about October 17, 2019, I was discharged from my position as a Branch Sales and Service Associate II. I was employed in this position since 2016. I am Russian and Ukrainian. I am the only person of my nation origin that worked at Respondents location. My manager Vaughn Vaughnson, Black, harassed me due to my national origin. I complained to the Regional Manager, Raymond DiSandro that Mr. Vaughnson harassed me due to my national origin and retaliation due to my prior complaints about Mr. Vaughnsons prior unacceptable behavior from my email complaints. Mr. DiSandro told me that I needed to report to my allegations to Employee Relations, who then told me that I needed to complain to the Regional Manager. No one in Respondent wanted to help me. on or about October 8, 2019, I wrote a letter asking for a transfer to another branch so that they harassment can stop. While working at Respondent I received numerous awards and outstanding performances.

II.  Shannon Schweda, investigator told me that I was terminated for violating Respondents Referral Rule. This so-called rule was that once you spoke to a client you had to input them into the system the same day. It should be noted that Respondent does not have a Referral Rule and if they did no one

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Victor Bondaruk on 01-14-2020 11:22 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 530-2020-01754 |

| PENNSYLVANIA HUMAN RELATIONS COMMISSION | and EEOC |
|---|---|
| *State or local Agency, if any* | |

followed the rule or training was not given for the rule. Moreover, this was a business referral and the only training I received was how to open a business account.

III.      I believe I have been discriminated against due to my national origin Russian and Ukrainian, in violation of Title VII of the Civil Rights Act of 1964, as amended, in that I was harassed by my manager, and when I complained to Respondent, I was discharged by Respondent in retaliation for violating a rule that does not exist. The area in which Respondent is located is mainly Russian and they are underserved. After my discharge my job was posted, and it no longer requires that the employee speaks Russian.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Victor Bondaruk on 01-14-2020 11:22 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  **Victor Bondaruk**
     **2555 WELSH Road**
     **APT 232**
     **Philadelphia, PA 19114**

From:  **Philadelphia District Office**
       **801 Market Street**
       **Suite 1000**
       **Philadelphia, PA 19107**

|  | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2020-01754** | **Legal Unit,** **Legal Technician** | **(267) 589-9700** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Jamie R. Williamson*                              September 2, 2020

Enclosures(s)

**Jamie R. Williamson,**
**District Director**

*(Date Mailed)*

cc:
     **Sharon Werner**
     **Chief Counsel, Employment**
     **The PNC Financial Services Group, Inc.**
     **One PNC Plaza, P1-POPP-22-C**
     **249 Fifth Avenue**
     **Pittsburgh, PA 15222**

| | | The final day to timely appeal to this determination is November 22, 2019. |
|---|---|---|
| | **NOTICE OF** | SSN: ████-1021 |
| | **DETERMINATION** | Type Claim: UC |
| COMMONWEALTH OF PENNSYLVANIA | | AB Date: October 20, 2019 |
| DEPARTMENT OF LABOR AND INDUSTRY | | Mailed On: November 07, 2019 |
| OFFICE OF UC BENEFITS | | Page: 1 of 3 |

**CLAIMANT:**

VICTOR . BONDARUK
2555 WELSH RD APT 232
PHILADELPHIA PA 19114

**EMPLOYER:**

PNC BANK
398 N MAIN ST
DOYLESTOWN PA 18901

**FINDINGS OF FACT**

The claimant's last day of work was 10/17/2019. The claimant was discharged for violating a rule. The claimant did not admit to violating the rule.
The employer did not provide the specific rule.

**DISCUSSION**

In situations where the claimant is discharged for violating a rule, the burden of proof is on the employer to show that the claimant was aware, or should have been aware of the rule and that the claimant violated the rule. In order to qualify for benefits once this is established, the burden shifts to the claimant to show good cause for his actions. In this case, the employer has not sustained its burden of proof. As such, benefits for week ending 10/26/2019 and compensable week ending 11/02/2019 must be allowed under Section 402(e) of the Pennsylvania Unemployment Compensation Law.

**DETERMINATION**

The claimant is eligible for benefits under Section 402(e) of the Pennsylvania Unemployment Compensation Law beginning with waiting week ending 10/26/2019.

**UC Representative:  DRO**

**APPEAL INSTRUCTIONS**

**The last day to timely appeal this determination is:** November 22, 2019.

Under Section 501(e) of the Pennsylvania Unemployment Compensation Law, this determination becomes final unless you file an appeal.  For your appeal to be timely, it must be filed within fifteen calendar days after the mailing date shown on the determination.  However, if the fifteenth day is a Saturday, Sunday or legal holiday, you may file a timely appeal on the next business day.  If your appeal is not filed on time, the UC Board of Review will determine if you had good cause for filing a late appeal.

You may file your appeal online, or send a Petition for Appeal form or letter to the department by mail or fax.  Regardless of the format you choose, your appeal must include the name and address of the claimant, the social security number of the claimant, if known, the date of the determination being appealed, the reason for the appeal and the name and address of the individual filing the appeal.   If you use a Petition for Appeal form or a letter to appeal, you may file your appeal by mail, common carrier or fax, or by personal delivery to any CareerLink office.  Please follow these appeal instructions carefully:

The last day to timely appeal this determination is:  November 22, 2019
If you disagree with this determination, you may appeal.  If you want to file an appeal, you must do so on or before the date shown above.  Information for filing an appeal is included in this determination.



**pennsylvania**
DEPARTMENT OF LABOR & INDUSTRY
BUREAU OF LABOR LAW COMPLIANCE

1/2/20

Victor Bondaruk
2555 Welsh Rd
Apt 232
Philadelphia PA 19114

RE: PNC BANK

Dear Mr. Bondaruk:

You filed a complaint with the Department of Labor & Industry's Bureau of Labor Law Compliance (Bureau) alleging that your employer did not pay your legally-entitled wages in violation of Pennsylvania's Wage Payment and Collection Law (WPCL), 43 P.S. §§ 260.1 – 260.12.

The Bureau of Labor Law Compliance has been unable to resolve your wage claim against the above employer. Accordingly, we are closing our investigation in this matter. The decision does not represent a determination or assessment of the merits of your wage claim. It also does not preclude you from bringing a private action against the employer for the wages you claim are due to you. To the extent necessary, this letter serves as notification of reassignment of your wage claim back to you for private handling.

You may wish to consult an attorney about this matter. If you do not have or do not know of an attorney, you can contact the Pennsylvania Bar Association, Lawyer Referral Service (800) 692-7375 for assistance. Many county Bar Associations also have lawyer referral services.

Sincerely,

*Ed Ferguson*

Ed Ferguson
Bureau Investigator

Bureau of Labor Law Compliance
Philadelphia District Office | 110 North 8th Street, Suite 203 | Philadelphia, PA 19107-5157 | 215.560.1858 | www.dli.pa.gov

*Auxiliary aids and services are available upon request to individuals with disabilities.*
*Equal Opportunity Employer/Program*

LH-90 REV 04-16

# PNC's Position Statement



Sharon Werner
Employment Counsel
Direct: 412.762.6448
sharon.werner@pnc.com

March 5, 2020

Investigator David Cha
Equal Employment Opportunity Commission
Philadelphia District Office
801 Market St.
Suite 1300
Philadelphia, PA 19107

Re:   <u>Victor Bondaruk v. PNC Bank, EEOC Charge 530-2020-01754</u>

Dear Investigator Cha:

As counsel to Respondent, PNC Bank, N.A. ("PNC" or "PNC Bank"), I am submitting this position statement and attached documentation to respond to the charge of discrimination ("Charge") filed by Victor Bondaruk.  Please note that PNC is providing this information, which it considers to be confidential, with the understanding that the Equal Employment Opportunity Commission ("EEOC" or "Commission") will maintain this information in confidence, will use it exclusively in its investigation of the above charge, and will not disclose it to anyone outside the Commission without PNC's consent.  This disclosure of information to the Commission is for purposes of its investigatory proceedings and is not, and should not be, considered a waiver of the attorney-client or work-product privileges, which PNC maintains herein.   The information contained herein is based on PNC's investigation to date, and PNC respectfully reserves the right to amend this position statement in the future.  If there is any additional relevant information the Commission requires, PNC will provide it.

Mr. Bondaruk alleges in his Charge that PNC discriminated against him on the basis of his Russian and Ukrainian national origin, and retaliated against him for complaining of such harassment.  PNC adamantly denies these allegations.  As explained in greater detail below, Mr. Bondaruk was terminated from employment after manipulating sales records in an attempt to receive an incentive payment.  Accordingly, PNC Bank had legitimate, non-discriminatory reasons for terminating his employment and there is no basis for his claims of discrimination and retaliation.

## I.      FACTUAL BACKGROUND

### A.      <u>PNC Background and Relevant Policies</u>

PNC Bank's retail banking business provides deposit, lending, cash management and investment services to more than 6 million consumer and small business customers across 19 states

EEOC Charge 530-2020-01754
March 5, 2020
Page 2 of 6

and the District of Columbia, via more than 2,600 branches, online and mobile services, and 9,000 ATM machines.

One of PNC's most valuable assets is its reputation as an organization that adheres to the highest standards of ethics and integrity. Adherence to these standards depends upon its employees' commitment to PNC's corporate ethics model set forth in PNC's Code of Business Conduct and Ethics ("Code of Ethics"). *See* excerpts at **Exhibit 1**. All employees receive copies of the Code of Ethics upon their hire and periodic training on the Code of Ethics throughout their employment. The Code of Ethics sets forth PNC's expectations of its employees, including PNC's requirement that employees "[a]lways act in a professional, honest, and ethical manner." *Id.* at 5. Employees are warned that a violation of the Code of Ethics may result in disciplinary action up to and including termination of employment. *Id.* at 4.

PNC is committed to equal employment opportunity and providing a workplace that is free of discrimination and harassment as stated in the "Equal Employment Opportunity (EEO) and Affirmative Action" and "Bias, Harassment, Sexual Harassment and Other Inappropriate Conduct" policies attached at **Exhibit 2**.

In addition, PNC maintains an "Employee Expectations" policy, which notifies employees that working for a financial institution carries special obligations regarding integrity and honesty and instructs employees to behave in a manner that is consistent with and supports the Code of Ethics, PNC values, and other PNC policies and procedures. The Employee Expectations Policy also instructs employees that failure to comply with the policy may result in corrective action, up to and including termination of employment. *See* **Exhibit 3.**

Given the nature of PNC's business and the fact that many of its employees deal with money, PNC is required to bond each of its employees to protect PNC and its customers from embezzlement, theft and other related issues. Under its Fidelity Bonding policy, PNC employees are expected to be truthful and honest at all times when working for and/or representing PNC. PNC's Fidelity Bonding policy explains that acts of dishonesty may lead to termination of employment, and in particular, lists the manipulation of an incentive program as an example of a dishonest act that may lead to termination. *See* **Exhibit 4.** When there is an issue of potential dishonesty, PNC's Employee Relations ("ER") conducts a thorough investigation into the matter. If the ultimate determination of the investigation is that the person was dishonest, employment is terminated.

Some PNC branch employees qualify to participate in a Retail Sales Incentive Program. While working with customers, PNC branch employees are instructed to help identify the best PNC products for the customers' banking needs. When branch employees uncover a customer need that necessitates the assistance of other PNC partners in different areas of the bank, branch employees are instructed to refer that customer to a different area of the bank. When they make such sales referrals, branch employees may receive credit toward an incentive payment to supplement their salaries. PNC's Customer Referral Requirements clearly provide the guidelines to enter a customer referral into the PNC system. *See* **Exhibit 5.** The policy prohibits inappropriate or invalid referrals including "activities [that] were completed for the sole purpose

of manipulating the sales tracking system and Retail Incentive Program." *Id.* Specifically, this category includes "[p]lacing a second referral on a customer at any point, including when referrals expire prior to the sale/application." *Id.* Referrals to Merchant Service representatives – the type of referral at issue in this matter – remain active for 60 days. *See* **Exhibit 6.**

**B.      Mr. Bondaruk's Relevant Employment Background**

Mr. Bondaruk began his employment with PNC on August 1, 2016, as a Branch Sales and Service Associate ("BSSA") at the PNC branch on Welsh Road in Philadelphia, PA ("Welsh Road branch"). At all times relevant to this Charge, Mr. Bondaruk reported to Branch Manager Vaughn Vaughnson who, in turn, reported to Regional Manager Raymond DiSandro.

On October 7, 2019, Mr. Bondaruk and Mr. Vaughnson were both working at the Welsh Road branch, and Mr. Vaughnson conducted a prescheduled meeting with an existing PNC customer to discuss the customer's business needs. During their conversation, the customer expressed an interest in exploring a Merchant Services account with PNC. As this type of account requires a specialized service, Mr. Vaughnson and the client jointly called PNC Merchant Services Representative George Parkinson to discuss PNC's offerings. The customer agreed to continue speaking with Mr. Parkinson about opening a Merchant Services account. Throughout the customer's time in the Welsh Road branch on October 7, Mr. Bondaruk did not speak with the customer.

When the customer left the branch, Mr. Vaughnson entered the PNC system to record his referral of the customer to Merchant Services.[1] Upon doing so, Mr. Vaughnson discovered that Mr. Bondaruk entered the referral for that customer at the precise time that Mr. Vaughnson had been meeting with the customer earlier that day. When Mr. Vaughnson asked Mr. Bondaruk why he entered the referral without even talking to the customer, in clear violation of the Customer Referral Requirements, Mr. Bondaruk stated that this was "his customer." He claimed that he previously placed a referral to Merchant Services for this customer in June 2019, but that referral had expired so he was reentering his referral.

The following day, October 8, Mr. Bondaruk sent an email to Regional Manager DiSandro to complain that he had a dispute with Mr. Vaughnson regarding the referral for the customer in question. *See* **Exhibit 7.** In his email, Mr. Bondaruk clearly admits that he saw Mr. Vaughnson speaking with the customer and then entered his own referral for the customer without actually speaking with the customer. Mr. DiSandro immediately recognized that Mr. Bondaruk's actions violated PNC's Code of Ethics and forwarded the email to Senior Employee Relations Investigator

---

[1] Notably, due to his position as Branch Manager, Mr. Vaughnson's incentive payments were determined by the total number of referrals made by all employees at the branch; Mr. Vaughnson did not receive incentive payments for specific referrals that he personally completed. Therefore, there was no financial motivation for Mr. Vaughnson to take credit for Mr. Bondaruk's referral, whereas there was a financial motivation for Mr. Bondaruk to take credit for Mr. Vaughnson's referral.

EEOC Charge 530-2020-01754
March 5, 2020
Page 4 of 6

Shannon Schweda.[2]  In response, Ms. Schweda opened an official ER investigation into Mr. Bondaruk's actions regarding the referral.

Ms. Schweda spoke with Mr. Bondaruk on October 11, and he explained that he entered a Merchant Services referral for the customer after meeting with him in June 2019.  According to PNC policy, that referral would have remained active for 60 days.  *See* **Exhibit 6**.  Mr. Bondaruk claimed that he again met with the customer in September 2019, but did not reenter a referral because he assumed that his June referral was still active.  However, upon examination of Mr. Bondaruk's notes from his September meeting with the customer, Ms. Schweda found that Mr. Bondaruk did not discuss Merchant Services with the customer at that time; thus, such a referral would have been inappropriate.  Furthermore, Mr. Bondaruk admitted to Ms. Schweda that he entered a referral for the customer on October 7 without actually having a conversation with the customer on October 7.  Mr. Bondaruk expressed that he did so simply because his earlier Merchant Services referral from June had expired and he wanted credit for the referral.  Ms. Schweda found that such actions violated PNC's Customer Referral Requirements which prohibit employees from placing a second referral when the first referral expires and the Code of Ethics which forbids dishonest acts – in particular, the manipulation of sales records – in the workplace.

## II.    STATEMENT OF POSITION

PNC is committed to equal employment opportunity and to providing a workplace that is free of discrimination and retaliation.  PNC adamantly denies that Mr. Bondaruk was subjected to unlawful discrimination or retaliation.

In his October 8 email to Mr. DiSandro, Mr. Bondaruk clearly admits, in his own words, that he violated the Customer Referral Requirements and Code of Ethics when he reentered a referral for a particular customer even though he had not met with the customer again.  *See* **Exhibit 7**.  Mr. Bondaruk's explanation that the referral expired, or in his words "fell off the system," is still not a valid reason to reenter a referral.  Indeed, Mr. DiSandro instantly recognized Mr. Bondaruk's violation of the Code of Ethics and immediately forwarded the email to Ms. Schweda in ER to properly report the incident.

Mr. Bondaruk alleges in his Charge that PNC Bank discriminated against him on the basis of his national origin.  However, Mr. Bondaruk cannot show that a single similarly situated individual was treated more favorably than Mr. Bondaruk.  In the fourth quarter (October, November, and December) of 2019, PNC found a total of 13 employees – including Mr. Bondaruk – to have engaged in the manipulation of sales by improperly recording sales referrals.  All 13 employees were terminated from employment.  PNC does not obtain or maintain data regarding employees' national origin, except as it relates to race, and therefore cannot present exact comparative data.  However, as the chart below demonstrates, PNC consistently discharges employees of all backgrounds who are found to have engaged in sales manipulation without regard to any protected class:

---

[2] The time differential in the emails attached as **Exhibit 7** is attributable to different time zones.

| Name* | Gender | Race | Date of Birth |
|-------|--------|------|---------------|
| Victor Bondaruk | Male | White | 5/4/1985 |
| Employee DG | Female | Asian | 2/12/1971 |
| Employee MH | Female | White | 9/21/1959 |
| Employee CC | Female | White | 4/23/1967 |
| Employee BS | Male | White | 3/19/1988 |
| Employee CM | Female | Black/African American | 2/14/1962 |
| Employee SJ | Female | Black/African American | 2/21/1958 |
| Employee LW | Female | White | 12/23/1982 |
| Employee MS | Female | White | 3/4/1960 |
| Employee MB | Female | Did not identify | 11/23/1985 |
| Employee VL | Female | Asian | 6/15/1985 |
| Employee AM | Male | Black/African American | 1/4/1985 |
| Employee TH | Female | White | 4/24/1995 |

*Employee initials are used to protect the confidentiality of the employees.

The simple fact that Mr. Bondaruk was the only person of his specific national origin who worked at a specific PNC branch at a specific point in time does not automatically lead to the conclusion that his national origin was the *cause* of his termination. Rather, all PNC employees – regardless of national origin or any other protected class – who manipulate sales by improperly recording referrals are terminated from employment.

In his Charge, Mr. Bondaruk also alleges that Mr. Vaughnson harassed him due to his national origin. However, Mr. Bondaruk has failed to describe any specific behavior that would have constituted this alleged harassment. Mr. Bondaruk regularly emailed and called Mr. DiSandro, Mr. Vaughson's direct manager, to complain about a wide variety of problems he perceived with PNC, bank policies, his coworkers, and Mr. Vaughnson. Notably, in all of Mr. Bondaruk's complaints, there is no record of him ever complaining any kind of harassment or discrimination. It is curious that in all of his many communications with ER representatives, Mr. DiSandro, and Mr. Vaughnson, Mr. Bondaruk never mentioned that he felt any alleged mistreatment was due to his national origin. Such a claim was not made until he filed his EEOC Charge. Furthermore, Mr. Bondaruk never faced adverse action, or retaliation, for any of these complaints. His termination occurred only after he clearly violated the Customer Referral Requirements and Code of Ethics which he blatantly acknowledged in his October 8 email to Mr. DiSandro.

Finally, PNC has no record of Mr. Bondaruk's alleged October 8 letter requesting a transfer to a different PNC branch. Indeed, the email communication with Mr. DiSandro on October 8, attached as **Exhibit 7**, makes no mention of a transfer to a different branch.[3] In addition, Mr. Bondaruk's claim that PNC does not have a "Referral Rule" is directly refuted by the Customer

---

[3] In the past, there had been informal discussions about the possibility of Mr. Bondaruk transferring to a different branch. However, Mr. Bondaruk never took formal steps to transfer which would require him to apply to an open position at another PNC branch.

EEOC Charge 530-2020-01754
March 5, 2020
Page 6 of 6

Referral Requirements which are discussed with and available to all branch employees. *See* **Exhibit 5.** Indeed, in his October 8 email to Mr. DiSandro, Mr. Bondaruk appears to clearly understand the rules surrounding customer referrals.

As fully explained above, Mr. Bondaruk's admitted violations of the Customer Referral Requirements and Code of Ethics are the reasons he was terminated. PNC's action with respect to Mr. Bondaruk was in no way related to his national origin or complaints about his manager.

### III.    CONCLUSION

For the reasons set forth above, there is no evidence that PNC discriminated or retaliated against Mr. Bondaruk. Accordingly, PNC respectfully requests that the Commission dismiss his charge as being without merit.

Respectfully submitted,

*Sharon Werner*

Sharon Werner

# EXHIBIT 1

# CODE OF BUSINESS
# CONDUCT AND ETHICS








# Our Values

In today's competitive environment, it is vital to have a clear vision and strong principles to guide our actions. Our Values convey our strengths and create a solid foundation for ethical business behavior, continued growth, and a best-in-class work environment.

## > Customer Focus
We offer products, services and experiences that fulfill our customer's financial needs and goals in a clear and transparent way, while delivering on the commitments we make to them.

## > Diversity and Inclusion
We value our differences and work together to create a diverse and inclusive workplace where everyone can contribute to the success of our company.

## > Integrity
We are honest, do the right thing, conduct business with the highest ethical standards and enable our colleagues to raise concerns.

## > Performance
We expect excellence in all that we do.

## > Quality of Life
We promote the personal, physical and financial well-being of our employees, customers and communities.

## > Respect
We trust the capabilities, character and judgment of our colleagues, and treat each other with respect.

## > Teamwork
We work together to achieve our goals and celebrate our successes.

## A Message to All Employees

For more than 160 years, PNC has demonstrated a commitment to performance and integrity. This commitment has not diminished as we have grown to become a leading financial services company. Our Values and our Code of Business Conduct and Ethics serve as our guides to conducting business with the highest integrity and the highest ethical standards.

PNC has seven enduring core values that continue to serve us well:

Customer Focus, Diversity and Inclusion, Integrity, Performance, Quality of Life, Respect, and Teamwork.

Our Values reflect PNC's culture and serve to direct our day-to-day actions with customers and colleagues. Similarly, PNC's Code of Business Conduct and Ethics and related policies provide important guidance in conducting our daily affairs. They apply to all employees and directors of PNC. As a team, we have worked very hard to build a successful and well-respected company. We simply cannot — and will not — tolerate unethical or inappropriate behavior.

Remember, if you have a question or concern about what is proper conduct for you or anyone else, you may always talk to your supervisor, the Employee Relations Information Center ("ERIC") at 1-877-968-7762, or the Corporate Ethics Office at 412-768-8507. You may also report possible violations by calling the PNC Business Conduct and Ethics Hotline at 1-866-785-9753, where you may choose to remain anonymous.

Now more than ever, building a great company requires an unwavering commitment to the highest ethical standards:

> Living Our Values

> Embracing our Code of Business Conduct and Ethics

Each of us is accountable to do the right thing.

Sincerely,

*William S. Demchak*

William S. Demchak
*Chairman, President, and
Chief Executive Officer*

# Table of Contents

*Click any topic to hyperlink to page.*

Our Code and Your Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . 3
> Our Commitment to Ethics and Values
> To Whom the Code Applies
> Compliance with the Law and Regulations
> Employee Responsibilities
> Additional Responsibilities of PNC Leadership
> Protection from Retaliation
> Waivers and Exceptions
> Asking Questions and Raising Concerns

Acting in the Best Interest of Our Customers and the Public . . . . . . . . . . . 8
> Fair Dealing
> Conflicts of Interest
   *Self Dealing*
   *Insider Trading*
   *Outside Employment*
   *Outside Director, Officer, and Trustee Positions*
   *Transactions with PNC*
   *Inheritances and Fiduciary Appointments*

> Gifts and Entertainment
   *General Principles*
   *Business Entertainment*
   *Additional Restrictions—Rules for Gifts to and Entertainment of Government Officials, Rules for Employees of a PNC Broker Dealer, and Rules for Gifts to and Entertainment of Union Recipients*

Protecting Our Information and Assets . . . . . . . . . . . . . . . . . . . . . . 18
> Creating Business Records
> Document Retention
> Confidential Information
   *Employee Privacy and Customer and Client Confidentiality*
> Protecting Company Assets
> Intellectual Property
> Proper Use of PNC Technology
> Communicating with the Public

Following Laws and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . 25
> Operating as a Regulated Company
> Antitrust and Fair Competition
> Political Involvement
   *Holding or Campaigning for Political/Public Office, Political Contributions, and Political Spending*
> Global Trade and Anti-Corruption
   *Trade Sanctions, Embargo Programs, Anti-Boycott Laws, and Anti-Corruption and Bribery*
> Anti-Money Laundering

Glossary of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Key Contacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Notification and Pre-Clearance Process . . . . . . . . . . . . . . . . . . . . . 33

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34



# OUR CODE AND YOUR RESPONSIBILITIES

**OUR CODE AND YOUR RESPONSIBILITIES**

## Our Commitment to Ethics and Values

PNC's Code of Business Conduct and Ethics represents our commitment to live by the ethical standards expressed in Our Values and to comply with all applicable laws and regulations. To help us understand and meet these commitments, the Code defines PNC's expectations, provides guidance, and identifies resources to help address concerns.

The Code is an important reference tool, but it cannot address every situation, nor can it describe every law, regulation, or policy that may apply in our work. PNC has additional standards and policies for which references and links are provided throughout the Code. Although these policies are not part of the Code, it is very important that you become familiar and comply with them.

The Code also includes Questions and Answers that illustrate topics discussed in the Code and may help to address concerns that commonly arise. A Glossary of Terms is included to provide definitions of certain terms used within the Code.

As you review this Code, remember that our commitment to ethics and compliance rests on the strong foundation of Our Values. Our Values are more than words. They are a reflection of who we are and how we do business. They are the standards we live by and the characteristics by which we want to be known. Living Our Values sets us apart from the competition and demonstrates that we share a unified commitment to our customers, our communities, our shareholders, and one another.

## To Whom the Code Applies

The PNC Code of Business Conduct and Ethics provides the ethical guidelines and expectations for conducting business on behalf of PNC. The Code is a resource for all PNC employees and PNC's Board of Directors. It cannot address every issue that we may encounter but it does provide guidance and resources for those times when the right choice may not be clear.

Certain PNC business partners, such as vendors, agents, consultants, and other representatives, serve as an extension of PNC, and they are expected to adhere to the spirit of the Code, and to any applicable provisions, when working on behalf of PNC.

## Compliance with the Law and Regulations

Given the highly regulated environment in which PNC operates, it is important that you are aware of, seek to comply with, and never intentionally violate, relevant laws and regulations.

Violating relevant laws, regulations, or this Code, or encouraging others to do so, exposes PNC to risk, including risk to its reputation, and therefore may result in disciplinary action up to and including termination of employment.

You should understand that violations of laws or regulations may also result in legal proceedings and penalties including, in some circumstances, civil and criminal penalties that could affect you personally in addition to a risk of adverse consequences to PNC.

**OUR CODE AND YOUR RESPONSIBILITIES**

You should also be alert to changes in the law or new requirements that may affect your business unit, as well as new products or services that may be subject to special legal requirements.

## Employee Responsibilities

As a PNC employee, you are responsible for understanding and adhering to this Code.

> Always act in a professional, honest, and ethical manner when conducting your activities with and on behalf of PNC.

> Be familiar with the information contained in this Code and related ethics, human resources, and compliance policies. In addition, you should be well versed in any specific policies that pertain to your job responsibilities.

> Do not engage in or tolerate harassment of, discrimination against, or bias toward a customer or another employee.

> Provide all required notifications and obtain necessary approvals. If you are in doubt as to whether or not notification or approval is required in a particular situation, seek guidance from your supervisor, manager, or the Corporate Ethics Office.

> Never ask another employee to do something that would be prohibited by this Code.

> Cooperate and provide honest and accurate information in investigations, regulatory examinations, audits, and similar types of inquiries.

> Promptly report concerns about possible violations of laws, regulations, or this Code, whether it be by a colleague, customer, or vendor, to the appropriate individuals. The section of the Code titled "Asking Questions and Raising Concerns," found on page 7, details several methods by which you can report your concerns.

> Complete required Code of Business Conduct and Ethics training in a timely manner and keep up-to-date on current standards and expectations.

## Additional Responsibilities of PNC Leadership

If you are in a leadership position at PNC, you have additional responsibilities.

> Create a work environment where ethical business conduct is recognized and valued.

> Never permit or ask an employee or anyone acting on behalf of PNC to do something that would be prohibited by this Code.

> Be a resource for employees. Communicate to employees about how the Code and related policies apply to their daily work.

> Serve as a role model for the highest ethical standards and work to create and sustain a culture of integrity.

> **Q:** In my country, our local laws differ from the standards in PNC's Code of Business Conduct and Ethics. What should I do?

> **A:** If you believe local laws conflict with the Code or related policies, please discuss the issue with the Corporate Ethics Office.

**OUR CODE
AND YOUR
RESPONSIBILITIES**

> Be proactive. Take reasonable actions to prevent and identify misconduct within your work group and report any situation that might impact the ability of employees to act ethically.

> Create an environment where employees feel comfortable asking questions about, and reporting potential violations of, this Code and PNC policies.

> Be aware of the limits on your authority and do not take any action that exceeds those limits. Delegate authority only where permissible under corporate policies and otherwise appropriate.

> Take prompt corrective action to remedy business conduct that is inconsistent with this Code or related policies.

## Protection from Retaliation

Retaliation is a serious violation of Our Values and this Code. Regardless of the conduct you report, PNC will not tolerate any employment discrimination or retaliation because you made a good faith report of an alleged violation of this Code or PNC policies to management, your supervisor, or another reporting avenue specified on page 7 of this Code. Additionally, PNC will not tolerate retaliation for appropriate reports of an alleged violation of this Code or PNC policies made to regulatory authorities.

Allegations of retaliation will be investigated and appropriate action will be taken. This may include disciplinary action up to and including termination of employment for those responsible for retaliation.

If you believe that you or someone you know has been retaliated against for raising an ethics concern, contact the Corporate Ethics Office or call the PNC Business Conduct and Ethics Hotline.

## Waivers and Exceptions

From time to time, PNC may amend or waive certain provisions of this Code. If you believe that a waiver may be appropriate, discuss the matter with the Corporate Ethics Office.

The Corporate Ethics Office also has responsibility for interpretation of the provisions of this Code and their applicability.

In the case of directors and executive officers, any proposed waiver or exception must be approved not only by the Corporate Ethics Office but also by the appropriate committee of PNC's Board of Directors. PNC will disclose publicly waivers or exceptions granted to directors and executive officers to the extent required by law or the rules of the New York Stock Exchange.

> **Q:** My business unit sets various goals that we are asked to achieve. Sometimes I feel pressured to violate the Code to achieve these goals. Is this acceptable?

> **A:** No. While successful businesses set high goals and employees strive to achieve them, you should never violate the Code of Business Conduct and Ethics or PNC policies to achieve your goals.

# EXHIBIT 2



  | Contact Us | Quick Start Guide | News Online | Log Out

**YOUR SNAPSHOT     YOUR CAREER     INFORMATION CENTER**

EEO AND AFFIRMATIVE ACTION

## TRENDING NOW

- ➤ Career Development
- ➤ Year-End Performance and Compensation
- ➤ Workers' Compensation

- ➤ Medical Benefits
- ➤ News Online
- ➤ Recording Time

| ENTER TIME | ILEARN | LIVING WELL | YOUR TOTAL REWARDS | MONEYWISE |
|---|---|---|---|---|
| How To Guides & Resources | Compensation | Benefits    Retirement & Investments | Career Development | Working at PNC |

## EEO and Affirmative Action Rev. June 20, 2019



**WHO**

All PNC employees and all applicants for employment.

**WHAT**

Affording equal opportunity to all employees and applicants for employment.

**WHEN**

Applicable to all aspects of employment including recruitment, selection, hiring, training, transfer, promotion, termination, compensation and benefits.

**HOW**

- Read the policy to understand it and apply it.
- Work with other employees and applicants without regard to their race, color, religion, national origin, gender, sexual orientation, gender identity/expression, age, ancestry, marital status, genetic information, family medical history, disability, protected veteran status or any other basis prohibited by law.
- If you believe you have been the subject of, or you have observed, unlawful discrimination, report the issue to one of the following:
  - Your supervisor or manager;
  - The Employee Relations Information Center (ERIC
  - The Corporate Ethics Office at 412-768-8507; or
  - The Business Conduct and Ethics Hotline at 1-866-785-9753.

                                                                                    **SUPERVISOR**

**WHO**

All PNC employees and qualified applicants.

**WHAT**

Affording equal opportunity to all employees and applicants for employment.

**WHEN**

Applicable to all aspects of employment including recruitment, selection, hiring, training, transfer, promotion, termination, compensation and benefits.

**HOW**

- Read the policy to understand and apply it.
- Work with other employees and applicants without regard to their race, color, religion, national origin, gender, sexual orientation, gender identity/expression, age, ancestry, marital status, genetic information, family medical history, disability, protected veteran status or any other basis prohibited by law.
- If you believe you have been subjected to inappropriate conduct or observe others being subject to such conduct, or if these issues are reported to you, you must report the issue to one of the following:
  - Your supervisor or manager;
  - The Employee Relations Information Center (ERIC);
  - The Corporate Ethics Office at 412-768-8507; or
  - The Business Conduct and Ethics Hotline at 1-866-785-9753.

*PNC reserves the right to change or terminate its benefit plans and policies at any time.*

## POLICY DETAILS

It is the policy of The PNC Financial Services Group, Inc. ("PNC"), in compliance with the law, to afford equal opportunity to all applicants and existing employees without regard to race, color, religion, national origin, gender, sexual orientation, gender identity/expression, age, ancestry, marital status, genetic information, family medical history, disability, protected veteran status, or any other basis that would be in violation of any applicable ordinance or law. Protected veterans include disabled veterans, active duty wartime or campaign badge veterans, recently separated veterans and Armed Forces service medal veterans. All aspects of employment including recruitment, selection, hiring, training, transfer, promotion, termination of employment, compensation, and benefits conform to this basic policy in order to further the principles of equal employment opportunity.  PNC does not permit, condone or tolerate unlawful discrimination, bias or harassment.

The Employee Relations Information Center (ERIC) is available to answer questions regarding the EEO policy.  If you believe you have been denied equal employment opportunity because of discrimination, bias or harassment, you should report it to your supervisor, the ERIC, the Corporate Ethics Office or to the PNC Business Conduct and Ethics Hotline. You will be protected from any retaliation for good faith reporting.  The ERIC is also available to provide guidance on issues or situations requiring workplace support.

## GENERAL SUPERVISOR GUIDELINES

It is the policy of The PNC Financial Services Group, Inc. ("PNC") to affirmatively implement equal opportunity to all qualified applicants and existing employees without regard to race, color, religion, national origin, gender, sexual orientation, gender identity/expression, age, ancestry, marital status, genetic information, family medical history, disability, protected veteran status or any other basis that would be in violation of any applicable ordinance or law. Protected veterans include disabled veterans, active duty wartime or campaign badge veterans, recently separated veterans and Armed Forces service medal veterans. All aspects of employment including recruitment, selection, hiring, training, transfer, promotion, termination, compensation and benefits conform to this basic policy in order to further the principles of equal employment opportunity and affirmative action.

Under the Americans with Disabilities Act as amended (ADA), we also have an important obligation to make reasonable accommodation to applicants and employees with disabilities who are otherwise qualified for PNC positions. As you consider candidates for positions, please talk with Human Resources if you have questions about ADA. (See "Interviewing Tips" and "Accommodation of Disabilities Policy" for guidance on ADA requirements.)  In addition, we may also make reasonable accommodations to the religious beliefs of our employees.  Questions you may have in this regard should be directed to ERIC.  Finally, PNC is an affirmative action employer.

In light of PNC's commitment, you will want to:

- Recruit, hire and promote people in all job classifications without regard to race, color, religion, national origin, gender, sexual orientation, gender identity/expression, age, ancestry, marital status, genetic information, family medical history, qualified disability, protected veteran status or any other basis that would be in violation of any applicable ordinance or law.
- Make employment and promotion decisions based on the principles of equal employment opportunity (taking into account, where appropriate, the accommodation requirements).
- Ensure that Human Resources actions affecting compensation, benefits, transfer, leave, return from leave, in-house training, education, tuition assistance, social and recreational programs and any other terms and conditions of employment are  administered without regard to race, color, religion, national origin, gender, sexual orientation, gender identity/expression, age, ancestry, marital status, genetic information, family medical history, disability, protected veteran status or any other basis that would be in violation of any applicable ordinance or law.

The senior corporate Human Resources manager has overall responsibility for implementing and administering PNC's equal employment programs.

## Your Responsibilities

As a supervisor you are expected to treat all employees fairly and equitably, and to make decisions regarding employees in an objective and consistent manner within the parameters of this policy.

If you supervise a transgender employee who is transitioning, contact the ERIC for guidance and assistance in creating a plan for the individual.  There are many things to consider such as appearance standards; restroom access; name, gender and employee identification changes; client standards and rights to privacy and confidentiality.

RECENT PAGES AND FAVORITES  0 ITEMS

TERMS OF USE | PRIVACY STATEMENT

© 2020 The PNC Financial Services Group, Inc. All rights reserved.
Need help? Contacts: 1-877-968-7762, pncpathfinder@pnc.com

# EXHIBIT 3



      Contact Us | Quick Start Guide | News Online | Log Out

**YOUR SNAPSHOT**  **YOUR CAREER**  **INFORMATION CENTER**

EMPLOYEE EXPECTATIONS

## TRENDING NOW

- ➤ Career Development
- ➤ Year-End Performance and Compensation
- ➤ Workers' Compensation

- ➤ Medical Benefits
- ➤ News Online
- ➤ Recording Time

| ENTER TIME | | ILEARN | | LIVING WELL | | YOUR TOTAL REWARDS | | MONEYWISE |
|---|---|---|---|---|---|---|---|---|
| How To Guides & Resources | | Compensation | | Benefits  Retirement & Investments | | Career Development | | Working at PNC |

# Employee Expectations  Rev. January 21, 2020

**WHO**

All PNC employees.

**WHAT**

Information on fulfilling your role as a PNC employee by performing your job to the best of your ability and complying with PNC's Code of Business Conduct and Ethics and Ethics and Conduct Policy (the Code), other PNC policies and procedures and the PNC Values.

**WHEN**

While at work and when representing PNC.

**HOW**

- Review and know your responsibilities under the Code, PNC Values and other PNC policies, procedures and departmental guidelines. Perform your job in a manner that is consistent with these policies and values.
- Meet with your supervisor to discuss your role with PNC and the expectations for your position.
- Promptly report any policy violations to your supervisor, Employee Relations Information Center (ERIC), the Ethics Office (412-768-8507) or the Business Conduct and Ethics Hotline (1-866-785-9753).

**SUPERVISOR**

**HOW**

- Review PNC's policies such as PNC Values and the Code with all employees.
- Meet with both current and new employees to discuss their role with PNC and the expectations for the position.
- Model the appropriate behavior at all times.
- Promptly identify and discuss performance issues with employees and quickly resolve employee problems to eliminate further escalation.
- Manage performance by meeting with your employees on a regular basis to evaluate and provide feedback, including annual performance evaluations.
- Review the Performance Management and Corrective Action policies guidance on how to manage and improve employee performance and/or document performance deficiencies.  When applicable, utilize a Performance Expectation Plan (PEP) to assist you in this process, including your conversations with employees.
- Contact the ERIC for any policy violations or assistance with any employee relations issues.

*PNC reserves the right to change or terminate its benefit plans and policies at any time.*

**POLICY DETAILS**

You are expected to conduct yourself at all times in compliance with the Code and other PNC policies and procedures, and to perform your job duties and responsibilities to the best of your ability.

**Applicability**

All PNC employees.

**Purpose**

One of PNC's most valuable assets is its reputation as an organization that adheres to the highest standards of ethics and integrity. The confidence placed in all of us by our shareholders, customers, employees, regulators and the communities we serve depends upon our commitment to performing our jobs in a manner that is consistent with the Code, other PNC policies and procedures and PNC Values.

**Expectations and Responsibilities**

In order to fulfill your role as a PNC employee, it is expected that you will, among other things:

- Recognize that working for a financial institution carries special obligations regarding confidentiality, integrity, honesty and conflicts of interest;
- Behave in a manner that is consistent with and supports the Code, other PNC policies and procedures and the PNC Values;
- Comply with all government regulations applicable to PNC, as well as policies, procedures and departmental guidelines that pertain to your job and status as a PNC employee;
- Promptly report any policy violations to your Supervisor or contact ERIC, the Corporate Ethics Office or the Business Conduct and Ethics Hotline;
- Be courteous and considerate to customers, service partners and vendors, and always provide the highest possible level of service;
- Be professional and respectful in your interactions with customers and coworkers by avoiding the use of unprofessional language or derogatory behavior that is not aligned with the PNC Values;
- Understand the duties and responsibilities of your job and how to meet performance standards;
- Ask your Supervisor to clarify any questions concerning your responsibilities;
- Perform your job according to established performance standards;
- Initiate discussions of expectations and career objectives with your Supervisor;
- Carry out your Supervisor's work directions;
- Cooperate with and support other employees and your fellow service partners in getting the work done;
- Avoid any behavior that disrupts orderly and systematic accomplishment of the work and business objectives;
- Be enthusiastic and participate in work processes within your work unit;
- Keep an open mind to various points of view in resolving problems, disagreements and conflicting priorities; and
- Offer constructive suggestions for improving the quality of PNC life, services and products.

While you are employed by PNC, you have a duty of loyalty to PNC, which means that you must always act in the company's best interests. This includes, but is not limited to, avoiding these behaviors:

- Making business-related decisions in your own self-interest or that of family members, instead of in the best interest of PNC;
- Releasing confidential information regarding PNC or its customers to anyone outside of PNC or using such information in competition with PNC;
- Working for competitors while employed by PNC;
- Soliciting or encouraging employees to leave PNC;
- Working with others to leave PNC as a group; and
- Gathering or taking information with you to your next employer.

You should review and make yourself familiar with the Code, which provides additional requirements and an explanation of your responsibilities as an employee. If you have questions about its contents, you should ask your Supervisor, the ERIC or the Corporate Ethics office.

Failure to comply with PNC policies, procedures and departmental guidelines may result in corrective action, up to and including termination of employment.

GENERAL SUPERVISOR GUIDELINES

SUPERVISOR

PNC employees must conduct themselves and perform their job responsibilities according to the highest standards of ethics, business conduct and compliance, regardless of job title or classification. Keep in mind that you have your role as a PNC employee in addition to your role as a Supervisor.

As a Supervisor, you are delegated authority to direct the work of your employees and make sure that they understand their roles and responsibilities as a PNC employee.

**Purpose**

As a PNC Supervisor, you are a critical link within the organization. It is through you that policies and procedures are defined, communicated and interpreted. You execute policy and convey the image of the corporation to employees and customers. As a Supervisor, you are held to a higher standard and must conduct yourself in a manner that sets an example for others. How you approach leading and managing employees in your area of responsibility has a direct impact on how they view PNC as a place to work.

**Your Authority and Responsibility**

Your role as a Supervisor is to plan, direct, coordinate, communicate, provide feedback and evaluate the work of employees; however, there is more to your role than giving direction and critiquing results. You are responsible for communicating management's goals and objectives, administering PNC policies and procedures, and living and supporting PNC's Code and Values. Creating a work environment that motivates employees to excel and building teams that exhibit and share a sense of pride in providing customers with quality products and services is also your responsibility. A part of your role is to correctly identify and resolve employee issues. You can accomplish this through listening, interviewing, coaching and counseling employees. Keep in mind that issues you identify and fail to address can worsen and often spill over into other parts of the organization and/or into the work lives of employees.

You are responsible for keeping your management team informed as issues arise. In addition, you must contact ERIC to escalate any potential violations of the Code.

**Process**

In order to fulfill your role as a PNC Supervisor, it is expected that you will follow these guidelines, in addition to reviewing and becoming familiar with the Code:

**General**

- Behave in a manner that is consistent with PNC Values and the Code.
- Ensure bias, harassment and intimidation are not tolerated in the workplace.
- Implement and maintain PNC's equal employment, diversity and affirmative action policies and goals.
- Keep employees informed of changes in corporate policies.

- Ensure that all policies and procedures are observed.
- Communicate and support the concerns of your employees to management, and management's concern to your employees.
- Be impartial and when possible, let employees know the reasons for decisions that might be interpreted as unfair.
- Protect the safety and health of employees and report any injuries of employees, customers or vendors.
- Encourage employees to maintain neat and orderly working areas.
- Implement suggestions that improve our products, services and the work environment.
- Help each employee understand the customer's needs and perspectives.

Performance-Related
- Communicate clearly to employees their responsibilities, goals and objectives for performance.
- Evaluate and measure the performance of employees based on job standards and objectives.
- Manage performance continually to identify any potential performance issues. Use a Performance Expectation Plan (PEP) and reference the Performance Management and Corrective Action policies to assist in improving the employee's performance.
- Manage performance continually to identify any potential internal performance issues and use the Corrective Action Policy to improve performance.
- Train employees in specific job duties and recommend internal and external training experiences.
- Help employees create a development plan for their career growth.
- Keep employees fully informed on all factors relating to their work assignments, work progress and opportunities for advancement.
- Develop a feeling of teamwork among employees.
- Know your employees as individuals and recognize the importance of diversity as a positive value in building strong work teams.
- Recognize good performance in a timely manner and throughout the year.

Compensation-Related
- Recommend salary adjustments, promotions, transfers and terminations.
- Approve authorized reimbursements of employee expenses.
- Schedule vacations, lunches and breaks.

Time Worked, Time Off, Recording of Time
- Manage absenteeism, tardiness and requests for time off.
- Review and approve timesheets in the Time Tracking System and schedule overtime.
- Ensure that employee data is kept current.
- Manage the organization and staffing in your area.

RECENT PAGES AND FAVORITES   0 ITEMS                         TERMS OF USE | PRIVACY STATEMENT

© 2020 The PNC Financial Services Group, Inc. All rights reserved.
Need help? Contacts: 1-877-968-7762, pncpathfinder@pnc.com

# EXHIBIT 4



  | Contact Us | Quick Start Guide | News Online | Log Out

**YOUR SNAPSHOT     YOUR CAREER     INFORMATION CENTER**

FIDELITY BONDING

## TRENDING NOW

- ➤ Career Development
- ➤ Year-End Performance and Compensation
- ➤ Workers' Compensation

- ➤ Medical Benefits
- ➤ News Online
- ➤ Recording Time

| **ENTER TIME** | **ILEARN** | **LIVING WELL** | **YOUR TOTAL REWARDS** | **MONEYWISE** |
| How To Guides & Resources | Compensation | Benefits | Retirement & Investments | Career Development | Working at PNC |

  

## Fidelity Bonding  Rev. February 24, 2020

**WHO**

All PNC employees.

**WHAT**

PNC employees are expected to be truthful and honest at all times when working for and/or representing PNC. The fidelity bond protects PNC and its vendors and customers from losses resulting from a dishonest act.

**WHEN**

PNC employees must be covered by PNC's fidelity bond from the first day of employment and must remain covered throughout the duration of their employment. If not bonded, the individual cannot continue to be employed by PNC.

**HOW**

If you believe another employee has engaged in a dishonest act, or if you have been arrested or convicted of a dishonest act, you are expected to report it to either a supervisor, the Employee Relations Information Center (ERIC), the Corporate Ethics Office or the Business Conduct and Ethics Hotline.

**SUPERVISOR**

**WHEN**

When there is the possibility that an employee has engaged in a dishonest act.

**HOW**

The moment you become aware of a possible dishonest act by any employee or applicant, you must immediately contact the ERIC. If the employee admits to a crime of dishonesty, breach of trust or money laundering, notify your manager immediately. If in the Consumer Bank, you must also contact a member of Loss Prevention prior to removing the employee from the work area.

**POLICY DETAILS**

To be employed at PNC, employees must be covered under its fidelity bond at all times. If PNC has a reasonable belief that the employee has engaged in a dishonest act (whether or not it constitutes a crime), coverage under the bond is suspended, and the employee cannot continue working at PNC. The employee cannot return to work at PNC unless and until bond coverage is reinstated.

**Applicability**

All PNC employees.

**Purpose**

PNC employees are bonded to protect PNC and its vendors and customers from losses due to dishonest acts of employees. Employees must be bonded in order to work for PNC. Dishonest acts violate the bond, regardless of whether there is actual monetary loss, and in such instances employment with PNC will likely be terminated.

**Expectations and Responsibilities**

You are expected to be truthful and honest at all times when working for and/or representing PNC.

If you believe that another employee has engaged in a dishonest act, or if you have, or another employee has, been arrested or convicted of a dishonest act, you are obligated to report it to your Supervisor, the Employee Relations Information Center (ERIC), the Corporate Ethics Office or the Business Conduct and Ethics Hotline.

If PNC believes you may have committed a dishonest act, you automatically are not bonded and you cannot remain at work. Depending on the circumstances, your employment may immediately be terminated, or you may be placed on a paid or unpaid leave of absence pending further investigation. During any such leave of absence, you cannot perform any work for PNC, other than providing information relative to the investigation or as may be necessary to enable others to perform your work in your absence. While in some circumstances PNC may assist you, it is generally your responsibility to resolve the issue in a timely manner. If you do not, your PNC employment will be terminated. In any event, you cannot return to work unless and until your bond has been reinstated.

If your employment is terminated as the result of a dishonest act, you may not be re-employed by PNC, nor may you perform services for PNC as a contractor or subcontractor or an employee of a vendor or temporary services agency.

If you are aware of a dishonest act, or if you have been, or another employee has been, arrested or convicted of a dishonest act, and you do not report it, you are subject to corrective action up to and including termination of employment.

Examples

Some examples of dishonest acts that may suspend bond coverage and/or result in termination of employment include but are not limited to:

- Signing a customer's name to a document;
- Notarizing a document when the person does not sign the document in front of you;
- Misrepresentation or lying about the completion of a work assignment;
- Misrepresentation or lying about the reason for an absence;
- Falsification of time sheets or misrepresenting information on a company document, including but not limited to expense reports, business documentation and the employment application;
- Misrepresentation or lying during an investigation or inquiry or knowingly providing falsified documents;
- Manipulation of incentive or award programs;
- False proofing/force balancing;
- Falsifying a call list; and
- Changing or adding to information on a document after it is signed by the customer.

In addition to events that occur while you are at work, your bond may also be suspended if you are arrested for committing, or PNC has reason to believe you have committed, an act of dishonesty outside of work. Examples include acts of dishonesty, breach of trust or money laundering.

Additional Information

PNC reserves the right to investigate the personal and criminal history of all employees. This also includes personal, financial and credit history checks.

You are required to cooperate with all investigations and inquiries as directed by PNC and to provide honest and candid answers. Failure to do so may result in termination of your employment, even if you did not otherwise commit a dishonest act.

GENERAL SUPERVISOR GUIDELINES

SUPERVISOR

This coverage begins on the employee's first day of employment with PNC.

PNC carries a fidelity bond, which is insurance to protect PNC from theft and other related losses when employees cause damages through dishonest or negligent action. The coverage under PNC's fidelity bond terminates for any employee when PNC reasonably believes the employee has committed a dishonest act whether at PNC or at any other time.

Any acts of dishonesty should be reported to the ERIC immediately. An investigation into the situation will occur. Employees must cooperate and be truthful during an investigation. If the employee is dishonest during an investigation conducted by PNC Loss Prevention, Security or an Employee Relations (ER) investigator, the bond coverage terminates, and the employee can no longer work for PNC. The ER investigator will inform you that the employee has been placed on Administrative Leave pending the review of the investigation.

Purpose

Our most valuable assets at PNC are our reputation and the confidence placed in all of us by our shareholders, customers, employees, regulators and the communities we serve.

The fidelity bond reimburses PNC for losses, up to the amount of the bond, for employee fraud, theft, forgery and embezzlement of the company's cash and other valuable assets.

Your Authority and Responsibility

With the exception of admitted theft or verified force balancing, the moment you become aware of a possible dishonest act by any employee or an applicant, you must immediately contact the ERIC. An Employee Relations consultant will assist you.

In situations where the employee has admitted to stealing or you have been able to verify that the employee force-balanced, you should take the following steps:

- Immediately discuss the situation with your direct supervisor. The two of you should thoroughly review the situation.
- If both of you agree the employee committed this act of dishonesty (stealing, force balancing), you may proceed with termination of employment without first contacting the ERIC. However, you should notify the ERIC that the termination occurred.
- You must also contact other areas per your department's protocols. Within the Consumer Bank, the identification of a dishonest act requires you to contact a member of the Loss Prevention Team prior to taking any termination action. If a termination involves a licensed employee, you also should consult with the Compliance Department. If you have any questions or concerns, contact the ERIC, and an Employee Relations consultant will assist you.

- If you terminate an employee, you must immediately process the termination. From within the Manager Tab of Pathfinder, go to the Action Hub and select Team Transactions, then click on the Terminate link and complete the termination transaction. For details on the termination meeting and follow up, see the How To - Terminate an Employee procedure.

Although not an all-inclusive list, the following situations identify dishonest acts: stealing cash, falsifying documents (including timesheets), withholding facts and information, and manipulating an incentive or award program. As a supervisor, going beyond the obvious, you need to think about your business and what could be considered a dishonest act. By heightening your awareness to potential dishonest acts, you will be better prepared to recognize when they happen and react immediately.

If a situation that clearly violates this policy happens outside of the normal ERIC business hours, and you are unable to speak with an ER consultant, you have the authority to place the employee on an administrative leave until you can contact the ERIC. Note that this type of action is serious and should be utilized with care.

When on administrative leave and not covered by our bond, the employee cannot access any PNC building or systems. The only exception would be going to a branch to conduct business as a customer.

If it is determined that the employee engaged in a dishonest or fraudulent act, his/her employment with PNC will be terminated.

Process
You may or may not need to be present during an investigation that results in bond coverage suspension.

If the employee is placed on administrative leave, the employee will be paid for the hours he/she is scheduled to work. The ER investigator will process the leave by submitting the request form to the Work Force Administration team. For part-time employees, you will need to input the hours that the employee was scheduled to work into the employee's Timesheet in the Time Tracking System. For details, see the How To - Place an Employee on Administrative Leave procedure.

The ER investigator will stay in contact with you and the employee and provide information on a need-to-know basis. Communicating in this way will protect the integrity of the investigation and maintain the necessary level of confidentiality.

Once the investigation is complete, the ER investigator will notify you. The employee either will be returned to work or terminated. If he/she is returned to work, you and the ER investigator will discuss if corrective action is appropriate.

RECENT PAGES AND FAVORITES   0 ITEMS                                          TERMS OF USE | PRIVACY STATEMENT

© 2020 The PNC Financial Services Group, Inc. All rights reserved.
Need help? Contacts: 1-877-968-7762, pncpathfinder@pnc.com

# EXHIBIT 5

# Customer Referral Requirements

Contact Person:  Last Reviewed Date: 10/28/2019                ★★★★⯪ |22

*Provides requirements that should be followed whenever making a customer referral.*

**Important!**
Generate and account for all customer referrals in the appropriate manner. Follow the below requirements at all times. If you are not sure your conversation warrants a referral, speak with your manager, or submit a HUB for clarification.

As part of the Retail Banking Strategy, all employees should document every conversation they have with a customer in Shared Notes, and the PNC Conversation/Cash Flow Conversation tab within Genesis.

Use Placing a Genesis Customer Referral for details on how to properly enter a Genesis referral.

**Referral philosophies**

- Referrals are designed to ensure that the financial needs of our customers remains at the forefront of every interaction.
- Valid referrals result in the selling and referring employee both receiving 100% credit, ensuring neutrality in our decisions to sell to or refer a customer.
- Appropriate referrals will always lead to the most effective and efficient path for our customers, delivering a series of consultative, financial needs-based conversations and solutions.

**What is a valid customer referral?**

A customer referral is a systematic way to identify that a Retail employee successfully uncovered financial opportunities through their customer conversations and must engage the necessary partners who can best meet their needs. The checklist detailed below will help employees determine if the potential referral opportunity identified is valid and should be immediately entered into Genesis.

**Referral checklist**

| If you are able to check off all of the required items based on your role, immediately enter your referral. | Sales Employee | Service Employee |
|---|:---:|:---:|
| I personally had a PNC Conversation/Cash Flow Conversation with the customer and uncovered a current financial need. | √ | |
| I personally spoke to the customer and uncovered a current financial need. | | √ |
| The customer stated an interest in the need you discussed with them and is committed to furthering the conversation. | √ | √ |

| | | |
|---|---|---|
| A partner is required to expand this conversation and fulfill the customer's need as my role does not permit me to open an account or sell a product of this nature; OR<br><br>I need to engage a designated partner* to ensure the best products or service options are discussed with the customer. | √ | |
| The referral is not considered inappropriate.  (See inappropriate referrals section below.) | √ | √ |

*For example: Mortgage Lending Officer (MLO), Home Lending Center (HLC), Business Banking Service Center (BBSC)*

If you cannot confidently check all of these items, your conversation is not referral eligible. Do not enter a referral. Important! Be aware that submitting a referral that does not meet the criteria of a valid referral may result in corrective action up to and including termination from employment. Submitting an invalid referral for the purpose of meeting performance goals and/or obtaining sales credit for incentive may be considered a dishonest act in violation of PNC's Code of Business Conduct and Ethics and PNC's Fidelity Bonding Policy and may result in immediate termination of employment.

The Retail Performance Reporting & Analytics management team reviews referrals on a regular basis to determine if they are appropriate. Any inappropriate referrals will be shared with the appropriate level of senior leadership for review and investigation, which may include the engagement of Employee Relations, if necessary.

Additionally, all Retail employees are required to adhere to the Self-Dealing and Conflict of Interest Principle within the PNC's Code of Business Conduct and Ethics in which employees are not permitted to enter referrals on themselves, a family member, or someone with whom they have a close personal relationship. The Self-Dealing and Conflict of Interest Principle, along with these Customer Referral Requirements, apply to the Retail Incentive Program and the employees that participate in the program. The details of the Chairman's Refer Program should be reviewed for direction on appropriate customer referrals to those employees eligible to participate.

**Appropriate Referral Partners**

Referrals to Ecosystem partners are permitted as long as the referral checklist can be met and the referral is not inappropriate. These include:

- Brokerage: Engaging a PNC Investment Advisor to further explore investment needs.

- Ed Lending: Engaging a specialist to discuss educational lending needs for students.

- Merchant: Engaging an MSAE to explore Merchant solutions for a small business.

- Wealth Management: Engaging a Wealth Management Client Advisor (WMCA) to explore wealth solutions for a newly identified Wealth Management customer.

- Mortgage: Engaging your MLO or the HLC to discuss all Home Lending needs (Mortgage or Home Equity). These referrals are permitted regardless of whether you are trained to complete loan applications.

The Branch/NFSC referral allows Retail employees to engage other Retail-based partners. While employees are currently able to view all referral types, you must only select the referral option that aligns to the partner(s) you need to engage. Referrals to employees of similar job function are not permissible, unless specifically identified below.

Important! The Branch/NFSC Referral Matrix below summarizes which employee types are eligible or ineligible to refer to, based on job role. Referral partnerships indicated with a "Y" are appropriate referral partnerships, whereas referral partnerships indicated with an "N" are inappropriate and not permitted for the entry of a referral in Genesis. The referral partnerships with an "N" indicate situations where the needs identified are ones you can fulfill yourself or they are partners you are not permitted to refer to directly.

**Branch/NFSC Referral Matrix** -- This matrix below applies only to the Branch/NFSC Genesis referral type and not the Ecosystem referrals listed above (i.e. Brokerage, Mortgage, etc.).

| Referral Detail Option in Genesis: Job Roles: | Branch Sales | | | | | | PCE | CCC | Business Bank | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Branch Banker (BSSA) (incl. Universal) UBS, & Branch Banker Associate (BSSR) on platform | Teller Lead, Teller, & Branch Banker Associate (BSSR) on teller line | Rel Banker (RB) | ABM/BM | WPB FSCs | Experiential | PCE RM | CCC Sales & Service Consultants | ABM / BM / RB | Business Bankers | CCC Bus Bankers | HC Bus Bankers | Ag Bus Bankers | SBA BDOs |
| Branch Banker (BSSA) (Incl. Universal) UBS, & Branch Banker Associate (BSSR) on platform | N | N | N | N | N | N | N | N | Y** | Y | Y | Y | Y | |
| Teller Lead, Teller, & Branch Banker Associate (BSSR) on teller line | Y | | Y | Y | N | N | N | N | N | N | N | N | N | N |
| Relationship Banker (RB) | N | N | N | N | N | N | N | N | Y | Y | Y | Y | Y | N |
| BM/ABM | N | N | N | N | N | N | N | Y | Y | Y | Y | Y | Y | N |
| WPB FSCs | Y | N | Y | Y | | N | Y | Y | Y | Y | Y | Y | Y | N |
| Experiential | Y | N | Y | Y | N | | Y | Y | Y | Y | Y | Y | Y | N |
| PCE RM | Y | N | Y | Y | N | N | | Y | Y | Y | Y | Y | Y | N |
| CCC Sales & Service Consultants | Y | N | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | Y |
| Business Bankers | Y | N | Y | Y | N | N | N | N | Y | N | N | N | Y | Y |
| CCC Business Bankers | Y | N | Y | Y | N | N | N | N | Y | Y | N | N | Y | Y |
| HC Business Bankers | Y | N | Y | Y | N | N | N | N | Y | Y | N | N | Y | Y |
| Ag Business Bankers | Y | N | Y | Y | N | N | N | N | Y | Y | Y | Y | N | Y |
| SBA BDOs | Y | N | Y | Y | N | N | N | N | Y | Y | Y | Y | N | |

\* While customers can be referred to PCE RMs via email to PCETeam1@pnc.com or by having the customer call 1-855-762-8682, there is currently no referral incentive award or corresponding Genesis referral type.

\*\* If a Business Banking opportunity, based on customer segmentation, requires a Branch Manager, Relationship Banker, or ABM to expand upon identified needs, Branch and CCC employees should submit a traditional business banking referral to the Skill Mastered BM, RB, or ABM. Business bankers should submit a branch sales referral.

- If BM is not skill mastered, no referral should be sent to them, but a warm handoff should occur. BM would then engage BBSC and place a referral to them, while the BBSC places a corresponding referral back to the BM. See the BBSC Program - Referral Job Aid for additional information.

- All other non-Skill Mastered platform employees should only contact the BBSC and place the appropriate referral to them if the Branch Manager or other Skill Mastered employees are not available.

**Non-Genesis partner referral:**

- Customers in the Corporate and Institutional Banking (C&IB) segmentation should be directed to the appropriate Relationship Manager **and** complete the <u>Commercial Segment Referral form</u> located on the Incentive Resource page.  Follow the instructions on the form to submit to the Retail Performance Reporting & Analytics team. Referrals must be entered immediately upon identification of clients, and before any new product sales are made. Referral forms submitted after sales are made (or CRM updated) are not eligible. See the <u>Commercial Segment Referral Requirements</u> for details.

**Mortgage Referral Matrix:** This matrix below applies only to home lending referrals (i.e., Mortgage Loan, Refinance, Home Equity).

| | | Referred To: | | | |
|---|---|---|---|---|---|
| | | Designated Lender Partner. | | | |
| **Job Roles:** | | Branch Banker(BSSA) (incl. Universal) UBS | Rel Banker (RB) | ABM/BM | MLO / HLC |
| Not Designated Lender | Branch Banker(BSSA) (incl. Universal UBS, & Branch Banker Associate (BSSR) on platform | Y | Y | Y | Y |
| | Relationship Banker (RB) | Y | N | Y | Y |
| | ABM/BM | Y | Y | Y | Y |
| | Teller Lead, Teller, & Branch Banker Associate (BSSR) on teller line* | Y | Y | Y | N |

*(Row group label on left: "Referred From:")*

\* If a home lending need is uncovered, a Branch/NFCS referral should always be directed to a Branch DL.  If there is no Branch DL, a Branch/NFSC referral should be directed to a Not Designated Lender Platform employee.

If a Not Designated Lender (NDL) submits a Mortgage/ HE referral to a Branch Designated Lender (DL) and the branch DL determines Mortgage as a possible option, the DL should enter a new mortgage referral (with Mortgage in the referral detail section) to the Mortgage Loan Officer (MLO)/ Home Lending Center (HLC). All referring parties are eligible for incentive.

**Note:** Branch DL should take care of any Home Equity needs directly and no other additional Mortgage referral type to the MLO or HLC would be needed.

**Inappropriate referrals**

Referrals are not designed to manufacture sales credit for activities that employees are expected to complete during the normal course of their job responsibilities. Inappropriate conduct occurs when employees place Genesis referrals on customers in situations where assisting the customer is simply the right thing to do as a PNC employee,

regardless of potential sales or incentive credit.

Based on the above definition of a valid referral, examples of inappropriate customer referrals may include, but are not limited to:

| Inappropriate/Invalid Referral Category | view |
|---|---|
| **1. Lack of valid PNC Conversation/Cash Flow Conversation** | **You did not have a needs-based conversation with the customer about future products or services.** |
| **Examples:** | |

- Helping a customer with a transaction, but not uncovering a new need.

- Introducing a customer to another employee because you cannot assist the customer at that time.

- Placing referrals on customers in your Book of Business when you did not have the conversation regarding the products or services. Book designated customers are not proprietary to the book owner.

- Placing a referral on a customer with whom you did not have a conversation so credit can be issued to you or your branch.

- Directing a customer to a salesperson after the customer proactively asks about products and services. If the need was not uncovered by you and another partner is required to complete the sale, it is not considered a valid referral.

- Placing a referral on a mass used TIN. Examples include, but are not limited to: Girl Scout, Boy Scouts, Brownies and IOLTAs. These conversations are not referral eligible under any circumstances.

- Placing a referral for an Assumptive Walkover when the conversation did not meet the above Teller referral checklist.

- Placing a referral on a PNC employee or customer with whom you did not have a conversation and uncover a need.

- Scheduling an apt in Apt Manager which automatically creates a referral when a customer asked to schedule a meeting with a banker or OneEco Partner, and no conversation took place to uncover the need.  (ex: Customer asks to meet with your PNCI partner and you schedule the apt in Apt. Manager which would automatically create a Brokerage referral for you.) In this case, an email should be sent to the appropriate individual so that they can schedule the apt for the customer.

| **2. Conflict of Interest** | **PNC does not permit you to conduct any transactions connected to these scenarios.** |
|---|---|
| **Examples:** | |

- Placing a referral on yourself, a family member, a relative or someone with whom you have a close, personal relationship.

- Placing a referral on a branch sales and service employee that you know personally and/or professionally.

- Placing a referral on a consumer or business customer where a perceived or actual conflict of interest may exist. Examples include, but are not limited to: an employee holding a position of authority (such as Treasurer of a Rotary Club or board member, etc.) in an organization and placing a referral on that organization.

| 3. Willfully manipulate incentive | These activities were completed for the sole purpose of manipulating the sales tracking system and Retail Incentive program. |
|---|---|

| Examples: | |
|---|---|

- Sharing the conversation over multiple employees for the sake of increasing the number of employees included on the sale by creating a Genesis referral to include those unnecessary partners.

- Placing a second referral on a customer at any point, including when referrals expire prior to the sale/application. Once you identify the correct partner for servicing the customer, no additional referrals to that partner type are required or permissible.

- Creating a prospect folder in Genesis in order to place a referral type that is currently being used on the existing folder.

- Using a referral type that is different than the appropriate referral partner because that referral type is already taken.

- Placing a referral or sales tracking while completing a sales or service transaction simply to receive potential incentive credit for additional products or services the customer may eventually open.

- Placing a "make-up" referral in the place of a referral you did not receive credit for.

- Placing an "Online" referral for a customer who did not state they will open the account online themselves.

- Placing any referral type solely because you were instructed to by a an employee, including EcoPartner or managers.

| 4. Partner not required to fulfill financial needs | The financial needs uncovered during your conversation do not require a partner in order to be fulfilled. |
|---|---|

| Examples: | |
|---|---|

- Sharing a customer because different employees within the branch have varying areas of strength or focus (e.g. one Universal Banker talks about a DDA, another discusses a HEIL and a third discusses a credit card).

- Placing a referral on a customer with whom you had a conversation and uncovered a need you can fulfill, but the customer was not willing to commit at that time. As you are able to complete the sale yourself, a referral is not permitted to be input. Employees should schedule an appointment for the customer or follow up with the customer at a later date.

- Placing a referral on a customer when you are making appointment setting calls and the customer is not able to meet with you or at your branch (excluding Customer Care Center teams).

- Universal Bankers placing a referral to another Universal Banker when they are completing service or lobby management activities. If you are unable to complete the sales activities yourself you should introduce the customer to another Universal Banker to meet the customer's needs but a referral should not be input.

# EXHIBIT 6

## Placing a Genesis Customer Referral

Contact Person: ██████████ Last Reviewed Date: 2/25/2020                    ★★⯪☆☆|9

*Details the steps on how to properly place a Genesis referral.*

**Important!**

All customer referrals must be generated and accounted for in the appropriate manner. Review the <u>Customer Referral Requirements</u> for details on following the requirements at all times. If you are not certain if your conversation warrants a referral, submit a <u>HUB</u> for clarification.

As part of the Retail Banking Strategy, all employees should document every conversation they have with a customer in Shared Notes, and the PNC Conversation/Cash Flow Conversation tab within Genesis.

Properly entering a referral

Upon confirming a referral is valid and meets the criteria stated within the <u>Customer Referral Requirements,</u> all referrals should be entered in Genesis immediately. Genesis provides clarity around how and when to place a referral within the referral applets. Click <u>here</u> for a Quick Reference Guide on entering referrals as an additional resource.

| Employees with Genesis access | Teller |
|---|---|
| 1. The referral must be properly entered no later than the same calendar day (and within reasonable business hours) in which the application was started. | |
| 2. The Primary account owner needs to be identified, including the account owner's first and last name. The referral then must be placed on that person (in the case of a minor account, this is the minor and not the custodian). | |
| 3. Prior to submitting the referral, the Primary account owner's Genesis profile must include either the correct:<br><br>• SSN/TIN or<br><br>• Customer Name and Home/Main Phone Number (Note: A valid phone number is always required in the referral) | |
| 4. Enter your referral in Genesis<br><br>Note: Refer to the referral types below. | 4. Enter your referral<br><br>• <u>Teller Referrals</u> |
| 5. Confirm your referral is in Genesis | 5. Request a Sales Employee to confirm your referral is in Genesis |

**Different ecosystem referral types**

| Branch/NFSC |
|---|

Branch/NFSC referrals are the most commonly used referral type. There are multiple Branch/NFSC referral types. This referral is used by all of the Retail channels (Branch, Business Bank, Customer Care Center, Workplace, University, Experiential, etc.).

| Referral Active for | 120 days |
|---|---|

| Sharing Rules | All employees connected to this sale via a referral will receive 100% of the applicable revenue credits. |
|---|---|
| Referral Credit Awarded by* | Motivator, our sales tracking system, matches active referrals to current sales.<br>Note: Employees do not need to close or status a referral in order to generate referral credit. |
| What You Need to Know** | You should select the Ecosystem referral based on who you are referring the customer to. For example:<br><br>• A Teller uncovers a Consumer deposit opportunity while speaking with a customer. The sale requires support from a Branch Banker (BSSA). The Teller would enter a Branch Sales referral.<br><br>• A UBC uncovers a Business lending opportunity with a customer. The sale requires support from a Business Banker. The UBC would enter a Traditional BB referral.<br><br>• A Business Banker uncovers a Healthcare Banking need. The sale requires support from the Healthcare Business Banker. The Business Banker would enter a Healthcare referral.<br><br>• A Customer Care Center employee discovers a checking account opportunity.  As a result of the Target Operating Model, it is better to make a Branch Sales Referral or an Online Referral. |

| How to Place a Referral*** | **Employees with Genesis access:**<br><br>1. Access the Referral tab in the Contact Folder and select the "Branch/NFSC" option from the Referral Type drop-down.<br><br>2. Select the Referral Segment that is best suited to assist with the customer.<br><br>3. Select the Referral Detail that is best suited to assist with the customer.<br><br>4. Complete the remaining available fields as required, making sure to include relevant details regarding the customer's financial needs.<br><br>5. Click on the gear icon on the upper-right side of the screen and select Save Record from the filter. | **Tellers:**<br><br>• Teller Referrals |

*The status codes that are provided in Genesis are informational only, they are only used to update the employee on progress with the customer.

**Tellers, Teller Supervisors and BSSRs (while working as a Teller) can only use the Branch Sales referral type. If this Ecosystem referral type is not available, they should not enter a referral in Genesis for this customer and hand off the customer to the Branch Banker (BSSA) or Branch Manager.

***If a specific Referral Segment and Referral Detail type has already been used, the employee should not select a different Referral Segment and Detail type solely to enter the referral in Genesis to receive referral credit. Referrals can be completed in Retail Genesis, Wholesale Genesis (CRM) or Teller Genesis.

| Brokerage Referral |
|---|

Brokerage referrals should be placed immediately when the employee uncovers customer interest in discussing

investment opportunities with a licensed PNCI Advisor.

| | |
|---|---|
| **Referral Active for\*** | 180 days (90 days for QIA credit) |
| **Sharing Rules** | Federal Regulations (Reg R) prohibits the sharing of credit on these awards. |
| **Referral Credit Awarded by\*\*** | The customer must complete a Qualified Investment Appointment (QIA) within 90 days with a PNCI Advisor in order for the employee to receive incentive credit. This qualification of the appointment is determined by the PNCI Advisor based on customer:<br><br>• Time<br><br>• Interest<br><br>• Money<br><br>Once they determine that the appointment met the qualifications, the PNCI Advisor will change the Genesis opportunity status to "Appointment Held" and add the "Appointment Date". This will award a QIA unit to the referring employee. |
| **What You Need to Know\*\*** | There are three vital fields you can see in the referral in Genesis to help you determine if you will or will not receive credit.<br><br>• Start Date: Referral must be qualified within 90 days of this date for QIA credit.  180 days is the expiration date for Referred Revenue credit, and for the referral overall.<br><br>• Appointment Held Date: Must be populated with the date the appointment was held.<br><br>• Opportunity Status: Review to confirm if the PNCI Advisor considered this referral as qualified. |
| **How to Place a Referral** | **Employees with Genesis access:**<br><br>1. Access the Referral tab in the Contact Folder and select the "Brokerage" option from the Referral Type drop-down.<br><br>2. Complete the available fields as necessary, making sure to include relevant details regarding the customer's financial needs.<br><br>3. Click on the gear icon on the upper-right side of the screen and select Save Record from the filter. | **Tellers:**<br><br>• Teller Referrals |

**\*Important!** Employees must comply with the Investment Referral Requirements when making their referral. It is the employee's responsibility to review and understand the requirements prior to submitting any investment referral.

**\*\***No actual investment sale is required to award the QIA to the employee.

| |
|---|
| **Merchant Services Referral** |

Merchant Services referrals should be placed immediately when the employee uncovers a business customer who has expressed an interest in processing their Merchant Services through PNC.

| | |
|---|---|
| **Referral Active for** | 60 days |

| Sharing Rules* | The employee with the active Merchant Services referral and all employees with an active Branch/NFSC referral at the time the MSAE marks the Opportunity "Won". | |
|---|---|---|
| Referral Credit Awarded by | After the MSAE receives a signed agreement with the customer, they will review the Opportunity in Wholesale Genesis. Once the information is correct, they will mark the Opportunity as "Won". Credit will post the following business day. | |
| What You Need to Know | The MSAE determines which employee and which branch receives the credit based on how they complete the Opportunity. This information should match the Merchant Referral in Genesis. | |
| How to Place a Referral | **Employees with Genesis access:**<br><br>1. Access the Referral tab in the Business Folder and select the "Merchant Services" option from the Referral Type drop-down.<br><br>2. Complete the available fields as necessary.<br><br>3. Click on the gear icon on the upper-right side of the screen and select Save Record from the filter. | **Tellers:**<br><br>• Teller Referrals |

*Merchant Services referrals can only be submitted on the business Contact Folder in Genesis.
The procedure for Identifying a Merchant Services Prospect should be used when determining the appropriateness of submitting a Merchant Services referral.

---

## Mortgage Referral

The Mortgage referral should be placed immediately when the sales employee identifies a home lending opportunity and they are not certain if a Home Equity loan or a Mortgage will meet the customer's needs.

| Referral Active for | 120 days | |
|---|---|---|
| Sharing Rules | The employee with the active Mortgage referral and all employees with an active Branch/NFSC referral at the time of application will receive 100% of the applicable revenue credits. | |
| Referral Credit Awarded by* | **Mortgage Referral:**<br><br>• A mortgage or HEP application or preapproval must be taken within 120 days of the referral creation date.<br><br>• The mortgage or HEP loan is then booked within 365 days of the application or preapproval date.<br><br>• Any credit card sold by the MLO during the referral window, or within another 30 days of the loan booking date, will be credited to the referring banker. | **Branch/NFSC Referral:**<br><br>• A mortgage or HEP application or preapproval must be taken while the Branch/NFSC referral is active.<br><br>• The mortgage or HEP loan is then booked within 365 days of the application or preapproval date.<br><br>• Any credit card sold by the MLO during the referral window, or within another 30 days of the loan booking date, will be credited to the referring banker. |
| What You Need to Know | A Mortgage referral in Genesis prior to the application or preapproval is required for a branch to receive credit on a mortgage or HEP loan. | |

| How to Place a Referral | **Employees with Genesis access: | ***Tellers: |
|---|---|---|
| | • Mortgage Referral Process Using Genesis | Tellers should input a Branch/NFSC referral and direct the customer to discuss lending options in more depth with a Branch Designated Lender (DL). If there is no DL, a Branch/NFSC referral should be directed to a Not Designated Lender Platform sales employee. |

*The status codes that are provided in Genesis are informational only, meaning they are used to update the employee on progress with the customer. They do not award mortgage credit to an employee or a branch once marked "Closed".

** If a Not Designated Lender (NDL) submits a referral to a Branch Designated Lender (DL) and the branch DL determines Mortgage as a viable option, the DL should close the original Mortgage referral from the NDL and enters a new mortgage referral to the Mortgage Loan Officer (MLO)/ Home Lending Center (HLC). All referring parties are eligible for incentive.

*** Tellers should not submit a Mortgage referral on a customer. If a subsequent Mortgage referral is placed on the customer by the Platform sales employee, the Teller will receive credit for the mortgage as outlined above.

| Wealth Management (WM) and Institutional Investment Group (IIG) Referral |
|---|

A WM or IIG referral should be placed immediately when, during the PNC Conversation, the sales employee identifies that the customer is a potential WM or IIG client based on the criteria outlined below.

| Referral Active for | One year | |
|---|---|---|
| Sharing Rules* | **Client Meeting:** The employee with the active Wealth Management or IIG referral and all employees with an active Branch/NFSC referral at the time of appointment will receive 100% of the applicable revenue credits. | **Trust Sale:** The Wealth Management Client Advisor (WMCA) determines how they will share the applicable award which is based on how they submit their paperwork. |
| Referral Credit Awarded by* | **Client Meeting:** If the appointment is qualified, the WMCA will status the Genesis referral appropriately. The qualification of the appointment is determined based on the following criteria:<br><br>$1 million or more in liquid assets<br><br>OR<br><br>$250,000 in household income<br><br>OR<br><br>$2 million net worth | **Trust Sale:** The information is provided to the Retail Performance & Analytics management team once a month for reflection in PERFORM and SF01. |

| What You Need to Know | The Wealth Management referral type is used for consumer banking customers. The IIG referral type is used for business banking customers. | |
|---|---|---|
| How to Place a Referral | Employees with Genesis access:<br><br>1. Access the Referral tab in the Consumer Contact Folder and select the "Wealth Management" option from the Referral Type drop down; or access the Referral tab in the Business Banking Contact Folder and select the IIG option.<br><br>2. The referral will automatically be assigned to the appropriate WMCA.<br><br>3. Click on the gear icon on the upper-right side of the screen and select Save Record from the filter. | Tellers:<br>Tellers should input a Branch/NFSC referral and direct the customer to discuss their financial needs in more depth with a Platform Banker. |

*The Wealth Management or IIG referral will provide credit for both events.

---

**Commercial Segment Referral**

Referrals to Commercial Segment Relationship Managers are not made through Genesis. See the Commercial Segment Referral Requirements for additional information and instructions.

# EXHIBIT 7

**From:** DiSandro, Raymond D
**Sent:** Tuesday, October 08, 2019 8:35 AM
**To:** Schweda, Shannon ███████████████
**Subject:** FW ███████████████

Shannon,
I can't ignore this.

Victor just put plainly into this email that he placed a referral that would go against our code of ethics. He saw another employee speaking with a customer, then without speaking with the customer again, placed another referral in the system only because past referral expired.

As far as I'm aware, this goes directly against our code of ethics.

Please let me know the next steps.

**Raymond D. DiSandro, Jr.**
Sr. Vice President
Regional Manager - Bucks County

398 N. Main St.
Doylestown, PA 18901
Mail Stop F4-F077-01-2
█████████ (Office)
█████████ (Mobile)

**From:** Bondaruk, Victor
**Sent:** Tuesday, October 08, 2019 9:18 AM
**To:** DiSandro, Raymond D ███████████████
**Cc:** Parkinson, George J ███████████████
**Subject** ███████████████

Good morning Ray,

Yesterday, Vaughn met with the client I have been working with since day one. I have opened a business account, two credit cards and made merchant referrals several times first to Trish and last time to George. The client met with both of them, but still wasn't ready to proceed. He understood all solutions available, but still needed more time to make a decision as he told me back in September. All this time my referral was active. When I saw Vaughn started speaking with him, I went to his profile to make sure my referral was still active, but it fell off the system because I placed my last referral back in June. So I put another referral. During the conversation with George over the phone at Vaughn's appointment, the client agreed to meet with George again. Vaughn claims this is his referral, I totally disagree with him because I put the referral first and did this several times. You can see the shared notes. The client was already sold, but wasn't ready to submit the application. Last time, he met with George in July together with his brother who opened a business account with me and signed up for merchant services. I have

been working with ████████████ very closely nurturing every solution possible and Vaughn basically reaped the fruits of my labor.

Because of this disagreement, Vaughn ordered me to leave the branch immediately and didn't let me finalize my work. I needed to fax a dispute papers for the client (she already missed her deadline by one day) and submit my time for the day (Gail is the witness). Is this appropriate? Before the dispute, he wanted to discuss MC calls with me, but after the conversation started heating up, he ousted me from the branch.

Best Regards,
**Victor Bondaruk**
Branch Sales & Service Associate
NMLS# 1526917
Welsh Rd Branch
████████████

Clerk of Court
United States District Court
601 Market St, Room 2609
Philadelphia, PA 19106-1797

My phone number
(857) 928-6385